YORK HAVEN WATER & POWER CO. v. YORK HAVEN PAPER CO. .

(Circuit Court of Appeals, Third Circuit. December 5, 1912.)

No. 1,680.

1. NAVIGABLE WATERS (§ 46*)—RIPARIAN RIGHTS IN USE OF WATER—NATURE OF PROPERTY.

The rights of a riparian owner in the use of the waters of a stream, whether navigable or not, are incident to the ownership of the land bordering on the stream, and pass with the land without special mention in the deed; and while their enjoyment may be granted in whole or in part to another by the owner of the land, the grantee has no property therein, and the stipulated enjoyment is only enforceable against the grantor.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 283–291, 293; Dec. Dig. § 46.*]

2. NAVIGABLE WATERS (§ 22*)—RIPARIAN OWNERS—RIGHT TO DAM STREAM.

The right of a riparian owner on a stream notoriously navigable, or declared so by legislative enactment, to dam for milling purposes, must be conferred by an exercise of the legislative will amounting to a license.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 100–103, 105, 106, 108, 120, 132; Dec. Dig. § 22.*]

3. DEEDS (§ 138*)—CONSTRUCTION—"RESERVATION" OR "EXCEPTION"—CONVEYANCE OF RIPARIAN LAND.

A provision in a deed to riparian land on the Susquehanna river in Pennsylvania to a power company, with all water rights, except as reserved therein, requiring the grantee, "after the construction of a contemplated power plant," to furnish to the grantor a flow of water sufficient to develop 3,000 horse power, to be delivered at headgates to be constructed on the grantor's land adjoining, but not riparian, on which it operated a paper mill, the right to such flow of water being "reserved" by the grantor, created a "reservation," and not an "exception," there being at the time of the conveyance no dam to furnish such water power, but the grantee, as riparian owner, being licensed to build one by the Pennsylvania Milldam Act of March 23, 1803 (4 Smith's Laws, p. 20), and such reservation did not retain in the grantor any right or interest in the land or appurtenant water rights for which ejectment could be maintained or on which a trespass could be committed.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. § 456; Dec. Dig. § 138.*

For other definitions, see Words and Phrases, vol. 3, pp. 2538–2544; vol. 8, p. 7656; vol. 7, pp. 6140, 6141; vol. 8, p. 7787.]

4. NAVIGABLE WATERS (§ 46*)—RIPARIAN RIGHTS—EXCEPTION FROM CONVEYANCE OF LAND.

The right to use the water of a stream is dependent solely on the ownership of land in contact with the stream, and the owner cannot retain such right from a conveyance of the land which divests him of all riparian ownership.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 283– . 291, 293; Dec. Dig. § 46.*]

5. INJUNCTION (§ 57*)—RESTRAINING BREACH OF CONTINUING CONTRACT—EQUITY JURISDICTION.

An injunction will not be granted to restrain the breach of a covenant to furnish water power to complainant "for all time," since such an injunction would perform the office of a decree of specific performance, and require continuous supervision by the court.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 111–113, 130;. Dec. Dig. § 57.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**6. Injunction (§ 24\*)—Objections to Relief—Interference with Opera-**
**tion of Quasi Public Corporation.**

An electric power company, incorporated for the purpose, and which
has entered into contracts with municipalities and electric roads to fur-
nish light and power, is a quasi public corporation; and a court of eq-
uity, in the exercise of its discretion, should refuse to grant an injunction
to restrain its breach of a contract with a private corporation, the prob-
able effect of which would be to disable it from performing its other
contracts, if not to create insolvency, and when the contract sought to be
enforced itself provides for the payment of liquidated damages for its
breach.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 23; Dec. Dig.
§ 24.\*]

Appeal from the District Court of the United States for the Middle
District of Pennsylvania; Charles B. Witmer, Judge.

Suit in equity by the York Haven Paper Company, to the use and
benefit of Henry W. Stokes, receiver of said Company, against the
York Haven Water & Power Company. Decree for complainant, and
defendant appeals. Reversed.

For opinion below; see 194 Fed. 255.

Reynolds D. Brown, of Philadelphia, Pa., and Charles L. Bailey, Jr.,
of Harrisburg, Pa., for appellant.

R. Stuart Smith, of Philadelphia, Pa., W. U. Hensel, of Lancaster,
Pa., John P. Kelly, of Scranton, Pa., and Charles E. Morgan, of Phil-
adelphia, Pa., for appellee.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit
Judges.

GRAY, Circuit Judge. The York Haven Paper Company, the com-
plainant below (hereinafter called the Paper Company), from 1885
to 1901 owned a tract of land on the west bank of the Susquehanna
river. In 1901, the then stockholders of the Paper Company caused
the York Haven Water & Power Company, the defendant below (here-
inafter called the Power Company), to be incorporated, and to be con-
veyed to it the greater portion of the said tract of land owned by the
Paper Company, to wit, 374 acres, having a frontage on the said river
of about 6,825 feet.

The conveyance from the Paper Company to the Power Company
was effectuated through an intermediate conveyance to the Security
Title & Trust Company, of New York. The deed contained the fol-
lowing:

"Reserving also to the said York Haven Paper Company, its successors and
assigns, a sufficient flow of water to enable the said York Haven Paper Com-
pany to develop three thousand horse power for all time after the construc-
tion of a contemplated power plant by the said York Haven Water & Power
Company, said supply of water to be furnished said York Haven Paper Com-
pany without cost or charge to it, by the said York Haven Water & Power
Company and delivered at headgates to be constructed at the expense of
the said Power Company in accordance with plans to be approved by the
York Haven Paper Company, at such point on land belonging to the said
Paper Company as it may designate; and the said York Haven Paper Com-
pany is to be first entitled to receive from the said York Haven Water &

Power Company the said supply of water to enable it to develop the said thre·· thousand horse power, before any power which may be developed by the said York Haven Water & Power Company to be used by it or furnished by it to any person or corporation; and no power shall be used or furnished at any time by said York Haven Water & Power Company unless said Paper Company is so supplied with the water necessary to develop said three thousand horse power hereby reserved to it. And in the event of the said Power Company refusing or failing to supply the said water necessary to create said three thousand horse power, then the York Haven Water & Power Company shall pay to the said York Haven Paper Company at the rate of forty dollars per horse power per annum, for as many horse power as are represented by the difference between the amount actually furnished and the said three thousand horse power agreed to be supplied, and this payment to be considered as liquidated damages between the said York Haven Paper Company and the said York Haven Water & Power Company. In the event of the deficiency of supply being caused by destruction of or injury to the dam, race or waterworks in consequence of floods or ice, such liquidated damages shall not be enforced. Together with all and singular the water rights and privileges of the said grantor in the said Susquehanna river, except as hereinbefore reserved, ways, streets, alleys, passages, waters, water courses, rights, liberties, privileges, hereditaments and appurtenances whatsoever, unto the hereby granted premises belonging or in any wise appertaining; and the reversions and remainders, rents, issues and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever, of it the said grantor, as well at law as in equity, of, in and to the same."

Though the consideration named in the deed was nominal, a very large proportion of the bonds of the newly created Power Company passed, as alleged in the answer, to the Paper Company, and the greater part of its capital stock fell into the hands of stockholders of the Paper Company, as promoters of the scheme. The Power Company having thus been originally created in the interest and for the benefit of the Paper Company and its stockholders, a community of interest between the two companies continued to a time recently before the commencement of the present suit, the officers of the two companies being to a great extent the same.

Immediately after its creation, the Power Company built, as was contemplated, its power plant at the lower end of its water frontage and out into the river, damming the water at that point and extending a wing dam therefrom up the stream for a considerable distance, making a forebay, in which the water was raised to a sufficient height to be used for power purposes. It also constructed headgates and a conduit therefrom, to supply the water to the mills of the Paper Company, as stipulated for in the reservation contained in the deed from the Paper Company to the Power Company above referred to. These works were all constructed at the expense of the Power Company, but under the supervision of one Henry L. Carter, president of the Paper Company, as well as of the Power Company. The smaller tract of land, with the paper mills thereon erected, retained by the Paper Company, lay below and to the south of the tract conveyed by the Paper Company to the Power Company. This tract does not abut on the Susquehanna river, as expressly found by the court below, and the headgates for supplying the Paper Company with water are not the property of the Power Company, though built by it under the arrangement with the former company.

It appears from the evidence that the stockholders of the Paper Company, as promoters of the Power Company, had in view, when it was created, that it should engage in the business of supplying electric power and light to business concerns and municipalities within the region accessible to its operations, extending from York to Harrisburg, and various contracts to that end had been made on behalf of the Power Company for furnishing power to street car lines, manufacturing plants and electric lighting systems in the region aforesaid. At the time the Power Company was formed, it was understood by its promoters that its power plant for thus furnishing electricity for industrial purposes would require a flow of water capable of producing 20,000 horse power, including the 3,000 horse power for the use of the Paper Company. As this 3,000 horse power was reserved to the Paper Company for all time, and free of expense to it, it was necessarily in contemplation of the Paper Company and its stockholders at the time they caused the Power Company to be created, that its (the Power Company's) only source of revenue would be its capacity to furnish electrical power and electric lighting to customers in the region referred to, on the basis of the 21,000 calculated horse power, to be obtained by damming the flow of the stream. It appears from the evidence that the money secured from the proceeds of the securities of the Power Company remaining in its hands after the deduction of those delivered to or retained by the Paper Company and its stockholders, proved to be insufficient to defray the expense of the construction of works necessary to produce the requisite horse power. New issues of bonds and stock to a large amount were therefore made by the Power Company to raise the funds required for that purpose. The Power Company, after the completion of its works, entered upon its business of supplying electrical power and light to manufacturing concerns, street railways and municipal lighting plants.

It appears from the evidence that the bottom of the headgates, built by the Power Company under the supervision of the Paper Company, opening into the race, through which the water was conveyed to the paper mills, was nine feet or more above the bottom of the forebay containing the dammed up water, and from which the water power was supplied to the turbines of the Power Company, as well as to the mills of the Paper Company. Such being the situation, it necessarily resulted that when, in a dry season, the water was drawn down to the level, or nearly to the level, of the bottom sills of the headgates, the Power Company could still secure a flow of water which was not available, for the reasons stated, to the Paper Company. In order, therefore, that the Paper Company might at all times have its stipulated flow of water, it would be necessary that the height of the water in the forebay should be maintained considerably above the level of the bottom of the headgates. This, the Power Company claims, and its claim is supported by the evidence, it was not able to do at certain seasons of drought and low water in the Susquehanna, and that at such seasons, even if the Power Company were to abstain from any use of the stored water power, it would be unable to furnish more than a small proportion of the stipulated flow to the Paper Company.

This state of things having been brought about by low stages of water in the Susquehanna, and especially after a severe drought in 1907, complaints were made by the Paper Company to the Power Company, and various suggestions of accommodation, by equitably dividing the water power that was obtainable, were made by the Power Company.

On December 4, 1909, upon the petition of a New Jersey corporation, a creditor of the Paper Company, alleging, inter alia, that by reason of the interruption of the operation of its plant, resulting from failure of water power from the Susquehanna river, the Paper Company was without cash and quick assets sufficient to pay its current liabilities, the Circuit Court of the United States for the Middle District of Pennsylvania appointed Henry W. Stokes receiver of the property of the Paper Company, authorizing him to operate the plant and to manage and conduct the business of the company until further order of the court.

On January 10, 1910, upon petition of said receiver, the court ordered that he be authorized and directed to file a bill in equity against the Power Company, ancillary to the receivership proceedings, in the name of the Paper Company but for the use and benefit of the receiver of that company. Thereupon, the bill of complaint in this case was filed by the Paper Company, for the use of the receiver, praying for an injunction restraining the Power Company "until final hearing and perpetually thereafter, from appropriating or using at any time, for any purpose whatsoever, any water in said forebay necessary to allow a sufficient flow of water at the headgates of the Paper Company to develop said 3,000 horse power, reserved to the Paper Company as aforesaid." Also praying "that the amount of damages suffered by the Paper Company, and by your orator as its receiver, by reason of said wrongful use and appropriation by defendant of the said supply of water reserved" to the Paper Company, be ascertained, and that defendant be required to pay over to the receiver the amount so ascertained to be due.

The case having come on to be heard upon the pleadings and proofs on May 12, 1912, an interlocutory injunction pending the taking of an account was decreed by the court, restraining the Power Company from depriving the Paper Company, or its receiver, of a sufficient flow of water at the headgates of the Paper Company to develop the 3,000 horse power "excepted and reserved" to the Paper Company by its deed of May 30, 1901, and from appropriating or using at any time, for any purpose whatsoever, any water in the forebay of the said Power Company necessary to allow a sufficient flow of water at the said headgates to develop the 3,000 horse power, etc. It was further ordered and decreed that an account be taken of the damages sustained by the said Paper Company, by reason of the wrongful use and appropriation by the said Power Company and its receiver of the supply of water "excepted and reserved as aforesaid." And a special master was thereby appointed to ascertain and report to the court the amount of such damages.

From this decree the present appeal is taken. The main and im-

portant question raised by the specifications of error is, whether the plaintiff is entitled to an injunction, or whether he should have brought an action at law to recover the stipulated or other damages for any injury that may have been sustained.

It is not denied in the argument of the Power Company that the Paper Company has suffered damage by the conduct of the Power Company, nor is there any controversy as to the extent of such damage. "The sole question is whether the lower court should have granted an injunction."

The ground upon which equitable relief is sought is, that a right of property of the Paper Company in the water power incident or appurtenant to the riparian lands conveyed by it to the Power Company was "excepted" out of the grant by express words in the deed of conveyance. It is insisted that this right of property is an absolute one, and though described in the deed as a "reservation," was in reality an "exception" out of the subject-matter of the grant. The bill therefore prays for an injunction as of right. As said in the brief of counsel for appellee, "it is a bill to restrain a continuing trespass against this right of property."

It is contended on behalf of the appellant that by the deed of the Paper Company the entire riparian rights incident to the lands conveyed were vested in the Power Company without exception, and that the flow of water sufficient to develop 3,000 horse power was a reservation arising out of the thing granted, imposing upon the grantee a duty or obligation to deliver or render the same in the manner and under the conditions stated in the reservation and its auxiliary covenants.

It is apparent that the distinction between an exception and a reservation here relied upon, is vital and substantial, and the question whether the stipulation in the deed be one or the other, is to be determined, not technically or by what the parties have called it, but by what was the essential character and quality of the interest or right sought to be reserved.

[1] The ordinary rights of the owner of lands along which or through which a nonnavigable stream passes, have been long settled and are well understood. Such owner may use a stream thus flowing for his ordinary and domestic uses, or for any extraordinary purposes, so long as such extraordinary use does not interfere with the rights of others along or through whose lands the stream flows. These rights are incident to the lands in contact with the stream. They pass with the land and do not exist except in relation thereto. Enjoyment of such rights, in whole or in part, however, may be granted by the owner of the land to another, but the grantee has no property therein, and the stipulated enjoyment is only enforceable against the grantor.

[2, 3] The rights of riparian owners on navigable streams are essentially of the same character. Generally, they consist of right of access to the stream, as a public highway, and to such use of the water and the flow thereof as will not interfere with the public rights of navigation. There are other subordinate rights, such as the right to wharf into the stream, so far as it may not interfere with the rights

of others or with public navigation; the rights of fishery, etc. These rights, which may be called the natural rights of a riparian owner, are incident to the ownership of the land bordering upon the stream, whether navigable or not, and pass to the grantee of such lands without special mention in the deed of conveyance. If notoriously navigable, or declared to be so by legislative enactment, these natural rights are restricted so far as to exclude the right to any serious diversion of the water, by damming or otherwise. On such streams or rivers, the right to dam for milling purposes must be conferred by an exercise of the legislative will amounting to a license. Such was the nature of the right conferred by the so-called "Milldam Act" of March 23, 1803 (4 Smith's Laws, p. 20). By virtue of the license conferred by this act, the Power Company erected its transverse and wing dams, creating the forebay for the storage of water flowing past its lands to such height as might be necessary to develop the whole or such part as was possible of the 21,000 horse power contemplated by its promoters. Its right to this license came to the Power Company by virtue of the riparian ownership conveyed to it by the Paper Company. It was only by costly and extensive structures erected under this legislative license that the Power Company was enabled to even measurably meet the obligation imposed upon it by the reservation in question. It was with reference to this artificial water power thereafter to be created that the reservation and its auxiliary covenants were made. Clearly this was the creation of a right or interest which had no prior existence as such in the property conveyed. It was a new right or interest and was reserved as a rent or an easement might have been reserved. It was something that was created by and grew out of the transaction. The distinction is well illustrated in this very deed, where the grantor "excepts" a certain lot or parcel of land described by metes and bounds from the grant of the whole tract. The thing excepted was in esse, as is the coal or other minerals which are excepted from the grant of the land which they underlie, or the standing timber excepted from the land on which it grows. Sheffield Water Co. v. Elk Tanning Co., 225 Pa. 614, 619, 74 Atl. 742.

We think, therefore, that no right of or title to property was retained by the Paper Company by the reservation contained in its deed to the Power Company. No action of ejectment could be maintained therefor, and no trespass or tort could be committed thereon. The reservation was of a sufficient flow of water to enable the Paper Company to develop a certain horse power *after* the construction of the contemplated power plant by the Power Company, said supply of water to be furnished without cost or charge, and to be delivered at headgates constructed at the expense of the Power Company. The very existence, as well as the value of the interest reserved, rested in the obligation of the Power Company to construct the works and deliver and supply the water it had stored to the headgates of the Paper Company. For *"refusing* or *failing* to supply the said water necessary," etc., the Power Company is to pay to the Paper Company liquidated damages at the rate of $40 per horse power per annum.

In these covenants and stipulations, the whole value of the right or interest reserved to the Paper Company rests.

[4] Moreover, among the findings of fact made by the court below is the following:

"The property of the Paper Company does not abut on the Susquehanna river at any point, and the headgates of the Paper Company are not the property of the defendant."

It is well established that the right to use the water of a stream is dependent solely upon the ownership of land in contact with the stream. The Paper Company, after its conveyance to the Power Company, being no longer a riparian owner, could not possess riparian rights. As it could not exercise them, it could not retain them from a grant of lands which divested it of all riparian ownership. This being true as to ordinary riparian rights, a fortiori is it true as to the right growing out of the revocable license which the defendant enjoyed as a riparian owner under the "Milldam Act" of 1803. Whatever obligation, contractual or otherwise, defendant was under in respect to this right, the right itself could not be the subject of an exception in the deed of the Paper Company to the Power Company. It is a contractual right, as between plaintiff and defendant, but it is not a right of property for which a possessory action of trespass would lie.

Chief Baron Pollock, in delivering the judgment of the Court of Exchequer in the case of Stockport Water Works Company v. Potter, 3 Hurls. & Colt. 300, 325, is very clear in his exposition of the principle underlying such cases:

"There seems to be no authority for contending that a riparian proprietor can keep the land abutting on the river, the possession of which gives him his water rights, and at the same time transfer those rights, or any of them, and thus create a right in gross by assigning a portion of his rights appurtenant. It seems to us clear that the rights which a riparian proprietor has with respect to the water are entirely derived from his possession of land abutting on the river. If he grants away any portion of his land so abutting, then the grantee becomes a riparian proprietor and has similar rights. But if he grants away a portion of his estate not abutting on the river, then clearly the grantee of the land would have no water rights by virtue merely of his occupation. Can he have them by express grant? It seems to us that the true answer to this is that he can have them against the grantor, but not so as to sue other persons in his own name for an infringement of them."

No more, as we have said before, can a riparian owner divest himself of all riparian ownership and reserve as a right in gross any riparian rights incident to the lands conveyed. We therefore conclude that the failure of the defendant to supply the water power stipulated for in the reservation, cannot be regarded as a trespass upon an absolute right of property, whose constant recurrence renders the remedy at law inadequate, and as thus furnishing ground for relief by injunction.

[5] This brings us to consider whether the equitable remedy of injunction is appropriate and proper, under the circumstances of this case, to prevent a future infraction of the defendant's covenant with

the plaintiff, with an ascertainment and award of damages for past infractions. It can hardly be questioned that such an injunction would perform the office of a decree for specific performance, imposing upon the court the duty of enforcing the same for all time to come.

United Cigarette Mach. Co. v. Winston C. Mach. Co., 194 Fed. 947, 958, 114 C. C. A. 583, cited by counsel for the appellant, was a bill in equity by a buyer of patents covering cigarette machinery, with the exclusive right to sell the same, except in the United States, and with the right to require the seller to construct and deliver machines to the buyer for a specified price. It was alleged that the seller sold eight machines in foreign countries, thereby depriving the buyer of the profits therefrom. Injunctive relief was sought with an accounting. The liability of the defendant was not questioned, but in regard to the relief prayed for, the Court of Appeals for the Fourth Circuit said:

"Under the circumstances of this case, another reason for refusing an injunction lies in a rule, to which there are exceptions not here of interest, that an injunction will not be issued to restrain a breach of the long term contract. The contract at bar is without time limit. An injunction to prevent breaches of contract is frequently a negative enforcement of specific performance. 3 Pom. Eq. § 1341. Specific performance is frequently denied of contracts 'whose performance would be continuous and would require protracted supervision and direction.'"

In General Electric Company v. Westinghouse Electric & Mfg. Co. (C. C.) 144 Fed. 458, 462, a contract to remain in force for 15 years provided that defendant should not manufacture certain electrical controllers for use in the United States. Complainant in its bill prayed for an injunction, restraining further or future violation of the contract by defendant, and an accounting. The court in its opinion said:

"Assuming that the contract is valid between the parties, is it of such a nature that equity will interfere to prevent a violation thereof by either party? It is clear that equity cannot compel the General Electric Company to manufacture and sell to the Westinghouse Company controllers such as are described in the complaint. It is a continuing contract running for 15 years and the courts will not undertake to supervise a complete performance of such a contract. 2 High on Injunctions, § 1109; Marble Co. v. Ripley, 10 Wall. 339 [19 L. Ed. 955]; Tex. & Pac. R. Co. v. Marshall, 136 U. S. 393 [10 Sup. Ct. 846, 34 L. Ed. 385]. In Marble Co. v. Ripley, supra, the court said: 'Another serious objection to a decree for a specific performance is found in the peculiar character of the contract itself, and in the duties which it requires of the owners of the quarries. These duties are continuous. * * * No decree the court can make will end the controversy. If performance be decreed, the case must remain in court forever, and the court to the end of time may be called upon to determine, not only whether the prescribed quantity of marble has been delivered, but,' etc."

In the case at bar, the covenants are to supply and deliver at plaintiff's headgates so much water power *for all time,* and for all time the Power Company must itself refrain from using the water power created by its extensive and costly works until the water power stipulated for has been furnished to the plaintiff. A perpetual and continuing performance is of the very essence of the covenants, and in-

volves an enormous outlay of money and continuous effort on the part of the defendant. We think that the court below should not impose upon itself the duty of enforcing through the indefinite future the performance of such a contract. In this connection, it should be borne in mind that the jurisdiction of the court below to entertain this appeal is an incident to the receivership, and is not, therefore, of indefinite duration.

It is to be noted, too, that the enforcement of the injunction prayed for would result at many periods during the year in a total suspension by the defendant, the Power Company, of the use for its own purposes of such water power as was stored in the forebay. The earning power of that company would consequently be destroyed, as by its contract it was bound to deliver the requisite horse power at the headgates of the plaintiff for all time, free of charge. The Power Company would thus be brought to a standstill, both as to its own use of the water power, and that which was to be furnished by it to the plaintiff, and the court would be unable to compel the defendant, without revenue, to continue the extensive operation of providing water power under its license from the state.

[6] This brings forcibly in view another feature of this case, that the defendant is a quasi public corporation; it matters not whether declared to be such by judicial decision or now recognized as such from the inherent character of the purposes for which it was incorporated. Pursuant to these purposes of a quasi public nature, the Power Company immediately after its incorporation, entered into contracts with a number of municipalities, manufacturing concerns, electric roads, and others, to furnish light and electric power, for due compensation. It can hardly be denied that there is a probability that the enforcement of the decree of the court below would result in paralysis of the Power Company, and in disabling it, not only to furnish water power to the Paper Company, but to furnish electric light and power through a wide and thickly settled region of country. Such a probability appeals strongly to the wide discretion of a court of equity, as to the issuing or not issuing of an injunction.

The leading case of Tex. & Pac. R. Co. v. Marshall, 136 U. S. 393, 10 Sup. Ct. 846, 34 L. Ed. 385, is apposite on this point of public convenience, as well as of the difficulty of enforcing a continuous performance through an indefinite period. The city of Marshall agreed to give the railway company $300,000 in county bonds, and 66 acres of land within the city limits, for shops and depots, and the company, in consideration of the donation, agreed to permanently establish its eastern terminus and Texas offices at the city of Marshall, and to establish and construct at said city the main machine shops and car works of said railway company. After the expiration of a few years, Marshall ceased to be the eastern terminus of the road, and some of the shops were removed. The city filed a bill in equity to enforce the agreement. Mr. Justice Miller, in delivering the opinion of the Supreme Court, after noticing the contention of counsel for the city, that the word "permanent" meant what it said, and that for all time the

offices and shops of the company should be maintained at Marshall, said:

"But we are further of opinion, that if the contract is to be construed as the appellant insists that it should be construed, it is not one to be enforced in equity. We have already shown that to decree the specific performance of this contract, is to impose upon the company an obligation, without limit of time, to keep its principal office of business at the city of Marshall, to keep its main shops there, and its car works there, and its other principal offices there, although the exigencies of railroad business in the state of Texas may imperatively demand that these establishments, or some of them, should be removed to places other than the city of Marshall, and that this would be also required by the convenience of the public, in which case both the public convenience and the best interests of the railroad company would be sacrificed by a contract which is perpetual, that all of its business offices and business shall forever remain at Marshall. It appears to us that if the city of Marshall has, under such a contract, a remedy for its violation, it is much more consonant to justice that the injury suffered by the city should be compensated by a single judgment in an action at law."

In the present case, the situation is one where an adverse decree would measurably disable the defendant from performing its contract with the plaintiff, as well as from performing the public service imposed upon it by the act of incorporation and by the contracts made in pursuance thereof. Something more, therefore, is involved than the mere balancing of convenience and injury between the plaintiff and defendant, or deciding, where one party or the other has to be injured, which party should have the advantage—the defendant, who would probably be prevented from performing a quasi public service, or the plaintiff who has a contract, for the violation of which there is a remedy at law, whether entirely adequate or not. In this view of the position of the parties, the adequacy of the remedy at law should be considered. It was evidently in the contemplation of the stockholders of the Paper Company, who promoted the incorporation of the Power Company, and aided in carrying out the purposes of its incorporation by the contracts referred to, that, inasmuch as the water power to be supplied to the Paper Company was to be free of charge, the only source of revenue would be these contracts with the public for electric light and power, and that to take away this revenue in whole or in large part, would be to disable the Power Company from performing its contract with the Paper Company, or from storing water at all. We therefore find in the reservation of the deed in question, it is provided that, in the event of the said Power Company refusing or failing to supply the said water necessary to create said 3,000 horse power, the Power Company shall pay to the Paper Company, at the rate of $40 per horse power per annum, for as many horse power as are represented by the difference between the amount actually furnished and the said 3,000 horse power agreed to be supplied, which payment shall be considered as liquidated damages between the two companies. Such a settlement for the failure of the Power Company, from any cause, to furnish the stipulated amount of water power to the Paper Company, would leave the revenue of the former company wholly or in large part intact, and its financial ability unimpaired to maintain the large and expensive

works necessary to create the water power it was licensed to create, by the "Milldam Act" of 1803, for the benefit of the plaintiff as well as for its own.

We think the ends of justice and the equities of the case require a reversal of the decree below, and the dismissal of the bill without prejudice. And it is so ordered.