MOYER et al. v. BUTTE MINERS' UNION.

(Circuit Court of Appeals, Ninth Circuit.  November 5, 1917.)

No. 2875.

1. Specific Performance ⬤121(1)—Sufficiency of Evidence—Proof of Contract.

In a suit on behalf of the Western Federation of Miners, a voluntary unincorporated association, against the Butte Miners' Union, a corporation, for the specific enforcement of a provision of the charter issued by the federation and to the union that, in case of withdrawal of the union or forfeiture of its charter, its property should become the property of the federation, the evidence held to sustain a finding by the District Court that the contract was not established, in that the original charter, which had been destroyed, and in lieu of which the later one was issued, did not contain such forfeiture clause, and that the new charter had not been accepted by the union.

2. Specific Performance ⬤121(4, 9)—Proof of Contract.

One who seeks to enforce the specific performance of a contract must establish very clearly and to the entire satisfaction of the court, the existence of the contract, and its terms.

Appeal from the District Court of the United States for the District of Montana;  George M. Bourquin, Judge.

Suit in equity by Charles H. Moyer, as trustee for the Western Federation of Miners, a voluntary unincorporated association, and Charles H. Moyer, C. E. Mahoney, and Ernest Mills, as members of such association, against the Butte Miners' Union.  Decree for defendant, and complainants appeal.  Affirmed.

For opinion below, see 232 Fed. 788.

Canning & Geagan, of Butte, Mont., O. N. Hilton, of Denver, Colo., E. P. Kelly, of Butte, Mont., and Cæsar A. Roberts and Leslie M. Roberts, both of Denver, Colo., for appellants.

A. C. McDaniel and Peter Breen, both of Butte, Mont., for appellee.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

HUNT, Circuit Judge.  The principal parties to this suit are organizations of miners and workingmen.  Moyer, as trustee for the Western Federation of Miners, a voluntary unincorporated association of per-

sons with headquarters at Denver, Colo., and others, as members of such association, brought the suit against the Butte Miners' Union, a Montana corporation, for a decree adjudging that the Miners' Union has no interest in certain lands and property, and requiring the Miners' Union to perform all the terms of a certain charter from the above-mentioned Western Federation to the Miners' Union by conveying to the federation certain property described, and for injunction restraining the Miners' Union from asserting claim to the property described.

Plaintiffs allege that the Western Federation of Miners is divided into local unions of miners and workers in the different states of the United States, with headquarters in Denver, Colo.; that it has many thousand members; that about September 22, 1914, the Butte Miners' Union applied to the Western Federation for "a reissuance of a charter for a local union to take the place of its first charter," lost or destroyed; that thereafter the Western Federation issued to the corporation a charter, in which it was provided that the defendant should be known as "Butte Miners' Union, No. 1, Western Federation of Miners"; that the union, being installed, could elect members and transact business in accordance with the constitution and rules of the Western Federation of Miners. The charter recited that the union agreed, in accepting the charter, that it would conform to the constitution and regulations, and in default the charter might be revoked and the union suspended from "all rights and benefits accorded to the laws of the Western Federation of Miners," and, further, that if the union should "withdraw, or be dissolved, suspended, or forfeit the charter, then all property, moneys, books, and papers should become the property of the Western Federation of Miners." The charter binds the Western Federation "to sustain said union in the exercise of all its rights, privileges, and benefits as a local union under its protection." The charter was signed by Charles H. Moyer, President, and Ernest Mills, Secretary-Treasurer, of the Western Federation of Miners. The complaint alleges that the corporation, defendant, accepted this charter and worked thereunder until about June 15, 1915, when it passed a resolution withdrawing from the Western Federation and refusing longer to affiliate with it; that thereafter, about July 13, 1915, the Western Federation demanded that the union transfer to the federation all the property and money that it owned on the date of the passage of the withdrawal resolution just referred to; but the union refused to comply with the demand and claimed to own the property. Plaintiff pleads performance of the obligations incumbent upon it.

The Miners' Union by answer alleges its incorporation in 1881 under the laws of Montana, and admits that about September 22, 1914, it applied for a reissuance of a charter to take the place of the first charter, lost or destroyed, and says that the Western Federation sent a charter as heretofore described, but denies that such charter was a reissue of the charter lost or destroyed, which was dated May 15, 1893, or that it ever accepted the charter or worked under it, but, on the contrary, says that it rejected such charter upon its arrival, because it was not a reissue or duplicate of the former charter. It pleads that for a long time after the receipt of the pretended charter it refused to affili-

ate with the Western Federation of Miners, and that it never agreed upon the terms of the charter referred to by the plaintiffs, and that the plaintiff never lived up to the terms of the charter of 1893. Defendant denies that the property possessed by it ever rightfully became the property of the Western Federation, and avers that under the laws of Montana it was unable to make any such contract to bind itself or its property, or in any way to dispose of the property or its control. It then alleges that it was regularly incorporated under the laws of the territory of Montana in 1881, and has never sought dissolution; that by collections from its members it has built a hall, cared for sick and distressed members, and lived up to the objects of its corporate existence; that about May 15, 1893, it had about $60,000 on hand; that in May, 1893, it, with other miners' unions in several states, called a convention of delegates from the unions with a view to create harmonious interchange of relationships between certain labor unions, and that they created the Western Federation of Miners; that membership in the Western Federation is voluntary, and that the federation depends upon the voluntary revenue derived as per capita tax from the different unions; that, upon organizing, the federation as a central body adopted a constitution and by-laws governing the conditions under which new local unions could be admitted to membership; that there is no provision for forfeiture whereby the property of any of the local unions can become forfeited to or confiscated by the federation upon withdrawal of the local from membership in the Western Federation. It asks that plaintiff be enjoined from asserting any claim to the property belonging to the defendant. The District Court decreed that plaintiffs take nothing by the action, that they be enjoined from claiming the property involved, and that defendant is the sole owner of such property. Plaintiffs appeal.

[1] Upon the trial the case largely turned upon the question whether or not the original charter granted by the Western Federation of Miners to the Butte Miners' Union contained the following clause:

"It is agreed that, should the aforesaid union withdraw or be dissolved, suspended, or forfeit this charter, then all property, moneys, books, and papers shall become the property of the Western Federation of Miners."

The position of the federation is that the charter of May, 1893, contained this clause, and that the charter issued in October, 1914, was but a reissuance of the charter of 1893; that such charter became binding as between the parties; and that by the action of the Miners' Union, had on June 15, 1915, it put itself in a position where it became obligated to convey to the federation all property owned by it on June 15, 1915. The Miners' Union, on the other hand, insist that the clause heretofore referred to never was in the original charter, and, furthermore, that such a clause would have been and is illegal and void, as against public policy and the laws of Montana.

There was considerable testimony taken, and not a little conflict of statement, as to the contents of the charters of 1893 and 1914. The judge of the District Court, however, resolved the conflict by finding that the evidence was insufficient to establish plaintiff's contentions,

that the May, 1893, charter, which was granted by the Federation of Miners to the Miners' Union, and which was destroyed or lost in June, 1914, contained the clause appearing in the 1914 charter, whereby, in the event of withdrawal or forfeiture of charter, the property of the Miners' Union should become the property of the federation. In support of his conclusion the judge refers to the evidence as showing that, after a form of charter to be granted by the federation was adopted, the clause referred to was objected to, and a form without such a clause was printed by order of the Miners' Union and thereafter issued to it by the federation. Examination of the record shows that this view is supported by the evidence of several witnesses who were intimately associated with the affairs of the Miners' Union from the time of its early history, and who testified that the forfeiture clause, as they called the clause in question, was not in the old charter, and that the new charter of October, 1914, with such clause, was not a duplicate, and never was worked under or accepted by the union. The record gives substantially this history:

The original corporate objects of the Miners' Union, as stated in their articles of incorporation filed in 1881, were to protect the interests of the membership of the association and to hold such property as might be necessary for the protection of its good, and to enable it to establish subordinate organizations and to become a body politic. Incorporation was had under the statutes of Montana (Revised Statutes of 1879, p. 463), which authorized religious, benevolent, and other like corporations in Montana. Various amendments of the statutes cited have been made from time to time, but it is not material to cite them in detail. The corporation continued to raise funds among its individual members and to perform its corporate purposes until 1893, when, for reasons then evidently satisfactory to itself, it joined in creating the Western Federation of Miners, an organization of miners' unions in the several states, having objects declared in a constitution to be the union of the various miners' unions of the West into one central body, and to use means to maintain friendly relations between themselves and employers, and to endeavor by arbitration and conciliation to settle such differences as may arise between them, and thus make strikes unnecessary. Friendly relations continued to exist for years, and until about June, 1914, when grave difficulties arose between the Miners' Union and the federation, and the Miners' Union hall at Butte was destroyed, and the charter paper issued by the federation in 1893 was lost or destroyed, and never has been found. In September, 1914, however, the Miners' Union applied in writing to the federation for a reissue of a charter to take the place of its first charter, lost or destroyed. In applying, the Butte Miners' Union agreed that in acceptance of the charter applied for it would conform to all its provisions, and that the same were fully understood, and agreed to the constitution, by-laws, rules, and regulations of the Western Federation of Miners. Thereafter a charter dated October 3, 1914, was forwarded by the Western Federation to the Miners' Union, and in this charter was included the forfeiture clause heretofore quoted.

The testimony further discloses that when this charter was received a serious question at once arose within the Miners' Union as to whether this was a duplicate of the original charter, and whether or not it should be accepted by the union. The discussion revolved about the forfeiture clause, and the effect which might follow if the new charter was accepted with the clause providing that the property of the union would be forfeited if the Miners' Union might see fit to withdraw from the federation. Charles Baxter, a witness for the plaintiff, who. had been a member of the Miners' Union since 1890, and who frequently attended meetings of the organization, testified that he had frequently seen the first charter hanging on the wall of the hall, and had read it many times from beginning to end, but never saw any clause therein which authorized the forfeiture of any property by the Miners' Union; that he had observed a forfeiture clause in the new charter sent in 1914; that the question of the new charter was brought up at a meeting of the union; that the charter was read by some of the members and thrown aside without any action being taken on it; that there was an effort made to return the last charter to the federation, and that it was tendered back by a member named Lee; but that the person to whom it was tendered declined to accept it. Jack Oliver, another member of the Miners' Union, says that at a meeting of the Miners' Union in October, 1914, when the last charter was received, it was agreed that it should not be accepted; that it was remarked that under its provisions the property of the Miners' Union could be taken if it did not comply with the rules and regulations of the Western Federation of Miners; that at that time the Miners' Union had property; and that the Western Federation had never contributed to the acquisition of such property. On cross-examination this witness said that, as far as he knew, as an organization the Butte Miners' Union never took action upon the charter sent in October, but there was much discussion of it, and it was the general understanding that the charter was refused.

Frank O'Connor, who had been a member of the Butte Miners' Union since 1891, and had been president of the organization four or five times, said that the old charter did not contain a forfeiture clause, and that he recalled the time of the arrival of the new charter in 1914, but that the new charter was not a duplicate of the one that had been destroyed, and which had hung on the wall of the hall for years. "It differed," said the witness, "in that they controlled the whole property; they would take all our property; that is, they would take the Butte Miners' Union property under the clause they had in here; by accepting the charter they would take all our property, and we objected to it." Pat Leahy, another member of the union, said that the charter which had been received in 1893 disappeared when the Miners' Union hall was blown up in 1914; that when the new charter came he advised the members against accepting it, because "there was a clause in it that did not suit, and changed the intent of the former charter"; that at a meeting of the Miners' Union the matter was brought up under the head of "good and welfare of the meeting," and that the men

said, in referring to the new charter, "Throw it in the waste basket." He said that the new charter differed in another respect from the 1893 charter, in that it required the Miners' Union to conform to the terms, rules, and regulations of the federation, and in default thereof the charter issued might be revoked. Pat Lee, who was secretary of the Miners' Union in 1914, after the receipt of the new charter, testified that he wrote a letter as secretary (the letter is in the record), addressed to Ernest Mills, secretary of the federation, dated November 24, 1914, in which he advised Mr. Mills that the charter had been received, but that there was "some dispute about putting it up, as some of the members wanted a copy of the old charter from Helena." Witness said that he recognized that the new charter did not conform to the old one, but that the Miners' Union continued to act with the federation officials, although "they wanted a copy of the old charter under which they continued working."

There was additional evidence to sustain the defendant's contention that the 1914 charter was, in respect to the forfeiture clause, essentially different from the charter of 1893. On the other hand, it is fair to say there was testimony introduced by plaintiff from some old-time members of the Union, who said very positively that they were familiar with the original charter issued by the federation to the Miners' Union, and that the forfeiture clause in the 1914 charter was identical with that in the earlier one of 1893. To such effect was the evidence of J. J. Maher, who was at one time secretary and treasurer of the federation, and of J. C. Lowney, a member of the federation and in 1893 a member of the Miners' Union. There was also evidence that the union kept the 1914 charter until it was produced in court in June, 1915, and that some official business was done with the federation after October, 1914; but Lee, the witness who carried on the correspondence, says the union was acting under the old charter. But from June, 1914, relations between the two bodies seem to have been more or less disturbed, and finally, in June, 1915, the Miners' Union formally adopted resolutions wherein, after reciting the date of their incorporation, the fact of the creation of the federation, the destruction of the old charter, the history of their application for a new charter, and detailing the financial accounts between the two bodies, they referred to the suspension of the union by the federation, and, after reciting that the federation "is no longer a bona fide labor organization," concluded by rescinding and repudiating any contract that theretofore existed or might then exist between the corporation and the Western Federation by reason of the charter or in any other way, and declaring that the union withdraw from the Western Federation and return to the headquarters of the federation the charter received from it.

[2] It requires no extended citation of authority to sustain the rule that one who seeks to enforce the specific performance of a contract must establish very clearly and to the entire satisfaction of the court the existence of the contract and the terms thereof. Story, in his Eq-

uity Jurisprudence, §§ 769, 770, in writing upon specific performance of written contracts, says:

"If they are not certain in themselves, so as to enable the court to arrive at the clear result of what all the terms are, they will not be specifically enforced. In the first place, it would be inequitable to carry a contract into effect where the court is left to ascertain the intentions of the parties by mere conjecture or guess; for it might be guilty of error of decreeing precisely what the parties never did intend or contemplate."

See Deeds v. Stephens, 10 Idaho, 332, 79 Pac. 77; Pomeroy's Equitable Remedies, §§ 764, 765.

The present case is not one which calls for departure from the general rule that where there is a serious conflict in the evidence, and the District Court has had the advantage of seeing and hearing the witnesses, and has decided that the weight of the testimony as to the existence of a fact is with the one side as against the other, the appellate court will not disturb the conclusion of the lower court, but will confine its review to the questions of law presented for its consideration. Under this view the charter of 1914 was not the charter requested by the Miners' Union, and the union was therefore not bound by the terms of such charter, unless the action which they took after the receipt of the 1914 charter made a complete contract with respect to the new charter. But this contention cannot be sustained, for again the court has decided against the plaintiff upon the issue. Moreover, we are clearly of the opinion that under the evidence the action taken by the Miners' Union and its officers after the receipt of the 1914 charter is inconsistent with the view that the union intended to accept it in the form it was sent, or intended to act under it and to be bound by its terms. The corporation never treated it as a reissue. No record of corporate adoption appears. The witness Lee, who wrote the letter of November 24th, heretofore referred to, to the secretary of the federation, said that after mailing that letter the Miners' Union never was able "to receive any communication, or any recognition, or any reports that the constitution provided should be sent to the various locals from the federation," and that the reason why the union did not formally withdraw at once was that a suit had been filed in December, 1914, by the federation against the officers of the union, and under legal advice withdrawal while the suit was pending was thought inadvisable.

Our conclusion is that, the District Court having had very substantial evidence upon which it decided as a direct issue that the plaintiff had failed to establish the essential foundation upon which it could seek specific performance, this court should not reverse the action of the lower court. Hennessey v. Woolworth, 128 U. S. 438, 9 Sup. Ct. 109, 32 L. Ed. 500; Colson v. Thompson, 2 Wheat. 336, 4 L. Ed. 253. As this point is decisive of the case, it is unnecessary to consider whether it would have been beyond the power of the union to make a contract such as was forwarded by the federation to the union in 1914.

Affirmed.