## UNITED FUEL GAS CO. v. SWISS OIL CORPORATION et al.

### No. 5266.

Circuit Court of Appeals, Sixth Circuit.

May 13, 1930.

Simeon S. Willis, of Frankfort, Ky. (Harold A. Ritz, of Charleston, W. Va., on the brief), for appellant.

Clinton Harbison, of Lexington, Ky. (E. L. McDonald and Wilson & Harbison, all of Lexington, Ky., on the brief), for appellees.

Before DENISON and HICKENLOOPER, Circuit Judges, and KILLITS, District Judge.

HICKENLOOPER, Circuit Judge.

The United Fuel Gas Company, appellant, filed its bill in the court below against the Swiss Oil Corporation, Thomas A. Combs, its president, and E. L. McDonald, its secretary, praying for a mandatory injunction requiring said defendants to resume delivery of natural gas produced under certain leases originally held by the Union Gas & Oil Company and assigned to the defendant corporation. While the owner of said gas leases, the Union Gas & Oil Company entered into a contract with the United Fuel Gas Company, both operating in the state of Kentucky, whereby it was agreed that the Union Gas & Oil Company "has sold, and does hereby sell," all of the natural gas that may be produced by the vendor from the lands named, together with such rights of entry, use, and occupation as the vendor had in and to the surface of said lands, to the extent that the United Fuel Gas Company might require for the purposes of the agreement. The agreement also provided for the construction by the United Fuel Gas Company of a pipe line from the pipe line then operated by the Central Kentucky Natural Gas Company, vendee and distributor of the United Fuel Gas Company, to a central point upon said leased lands; and for the construction by the Union Gas & Oil Company of gathering lines from producing wells then drilled, or thereafter to be drilled, and of a compressor station at a suitable point upon the pipe line to be constructed by appellant. Provision was made for measuring the gas delivered, by meter furnished by the United Fuel Gas Company and connected to the pipe line to be constructed by it, but upon a site to be furnished by the Union Gas & Oil Company. This meter was to be read daily by the latter company and statements based upon such readings were made conclusive upon both parties unless exceptions thereto in writing were made within ten days after the receipt of such statements. By paragraph 8 of the general covenants, the Union Gas & Oil Company agreed to diligently operate said lands for gas. The present controversy turns in large degree upon the provisions of section 9 of the general covenants, which is quoted in the margin.[1]

Having acquired all the capital stock of the Union Gas & Oil Company and having accepted independent assignment of the leases involved, the Swiss Oil Corporation continued for a time to furnish gas under the original contract while disclaiming liability or obligation so to do. Its dissatisfaction with the contract was one of price. In one of the letters of negotiation it stated: "The present price has not been sufficient to even pay the costs of the operation of the property, to say nothing of returning the costs of development, so that we could not continue such burdensome operations for your benefit." Having been unable to negotiate a new contract, deliveries were discontinued August 1, 1927, four grounds being principally relied upon in defense of the present action, viz.: (1) that the contract was not binding upon the defendant as assignee of the leases; (2) that the complainant had breached such contract by moving the measuring station from a point adjacent the compressor to the opposite end of its six-mile pipe line; (3) that the contract was terminable under section 9, in that gas was no longer being produced "in paying or marketable quantities;" and (4) that the relief sought was, in substance, the specific performance of the contract, which could not be granted since it involved continuous supervision of acts involving personal service, skill, and the exercise of discretion.

In Kentucky, contrary to the general rule, the courts seem to have adopted the doc-

[1] When the production of gas from said lands so decreases in volume that the second party (United Fuel Gas Co.) is unable to market therefrom under this agreement 100,000 cubic feet of gas per day, on an average, during the six winter months of any year, then either party hereto may terminate this agreement, after which no further liability shall accrue, and each party may reclaim its property used for the purposes of this contract. Unless terminated under the foregoing provisions, this contract shall remain in force for and during the entire time that natural gas is produced from said leased lands in paying or marketable quantities.

6

trine that oil and gas may be conveyed in place and that such oil and gas therefore partakes of the nature of real property. Compare Kennedy v. Hicks, 180 Ky. 562, 203 S. W. 318;· Scott v. Laws, 185 Ky. 440, 215 S. W. 81, 13 A. L. R. 369; Hudson & Collins v. McGuire, 188 Ky. 712, 223 S. W. 1101, 17 A. L. R. 148; Crain v. West, 191 Ky. 1, 229 S. W. 51;. Foxwell v. Justice, 191 Ky. 749, 231 S. W. 509; Eli v. Trent, 195 Ky. 26, 241 S. W. 324. Under a contract such as the instant one, in which a present sale of oil and gas in place is attempted, delivery to be made upon capture, an immediate equitable interest in such gas and in the leases themselves is created in the vendee. No legal title is conveyed, but an equitable title passes as soon as the gas is produced and the purchaser may come into equity to enforce such equitable title or interest. Union Stock-Yards Bank v. Gillespie, 137 U. S. 411, 11 S. Ct. 118, 34 L. Ed. 724. The fact that the defendant purchased with notice preserves that equity, and it would seem immaterial whether the covenants "ran with. the land" at law or not, if the question were simply one of the appellant's right to an injunction against cutting off the supply of gas otherwise to be marketed or used, or of the right of the appellant to go upon the lands, and itself gather, compress, and transport the gas by pipe line. People's Natural Gas Co. v. American Natural Gas Co., 233 Pa. St. 569, 82 A. 935; Southwest Pipe Line Co. v. Empire Natural Gas Co. (C. C. A. 8) 33 .F.(2d) 248, 252, 253, 64 A. L. R. 1229; Cf. Texas Co. v. Central Fuel Oil Co., 194 F. 1 (C. C. A. 8); Montgomery Traction Co. v. Montgomery Lt. & W. P. Co., 229 F. 672 (C. C. A. 5). In cases of exclusive or total production contracts, also, the inclination is strong to imply the negative covenant to sell to no other (Montague v. Flockton, L. R. 16 Eq. 189) and to enforce such negative covenant by injunction. Karrick v. Hannaman, 168 U. S. 328, 336, 18 S. Ct. 135, 42 L. Ed. 484. Such an injunction might here issue against a sale elsewhere, or the use of the gas by defendant, but this relief was not urged and was therefore not considered below. To this extent the contract seems to control the interests of the parties, and we do not find it necessary to decide whether the appellee is bound thereby further than as just indicated.

■ The defense that the appellant has itself breached the contract by moving the measuring station to the opposite end of the 6-mile pipe line, in which it is claimed there were numerous leaks and the defendant thus deprived of payment for large quantities of gas, is not tenable. The vibration of the compressor station was such as to cause disfigurement of the meter charts and difficulty in accurate measurement. Neither the measuring station nor the meters were in fact removed but an additional measuring station was constructed with knowledge of the Union Gas & Oil Company. Under the contract the duty rested upon the vendor to read the meters and no serious objection was thereafter raised to the use of readings from the new station in rendering statements. The contract makes such statements conclusive upon the parties unless objected to within ten days, and, while a right may have been existent in the vendor to resume readings from the original station, or to require construction of a new station nearer the compressor, we are of the opinion that the defendant is so far estopped by its silence and inaction that it may not now assert this defense to the present suit.

■ The third defense presents greater difficulty to the granting of specific performance. It will be noted that paragraph 9 of the general covenants expressly provides that the contract may be terminated by either party in the event that production falls below the average of 100,000 cubic feet of gas per day during the six winter months of any year. It is then provided that unless terminated under such foregoing provision, the contract shall remain in force as long as "gas is produced from· said leased lands in paying or marketable quantities." It is the contention of the appellant that the first provision establishes the criterion for determining, or defines what shall be considered, production in paying or marketable quantities; and that the second provision defines the period of continuance of the contract but creates no right of termination. The appellee contends that this section provides two separate and distinct grounds for termination of the contract; that the first is clearly stated as the production of less than an average of 100,000 cubic feet per day during the six winter months; and that the second arises whenever production so decreases in volume that the sale of gas becomes unprofitable to the vendor. The doubt arises from the use of the word "paying." Rock pressure had so far decreased, and the number of wells and length of gathering lines had so increased, together with an increase in the cost of labor and in the investment, as to make the return from sales scarcely sufficient to pay actual operating charges, without consideration of overhead, depreciation, and depletion. The District Court felt such doubt as to the precise and definite meaning of this latter clause as

would prevent the granting of specific performance, upon the familiar doctrine that specific performance should not be granted unless the contract be definite, clear, and free from other reasonably possible meaning. This doubt is so far shared by us that we are constrained to adopt the same position. Colson v. Thompson, 2 Wheat. 336, 4 L. Ed. 253; Nickerson v. Nickerson, 127 U. S. 668, 676, 8 S. Ct. 1355, 32 L. Ed. 314; Hennessy v. Woolworth, 128 U. S. 438, 442, 9 S. Ct. 109, 32 L. Ed. 500; Dalzell v. Dueber Watch-Case Mfg. Co., 149 U. S. 315, 325, 13 S. Ct. 886, 37 L. Ed. 749; Minnesota Tribune Co. v. Associated Press, 83 F. 350, 357 (C. C. A. 8); Standard Fashion Co. v. Magrane-Houston Co., 251 F. 559 (C. C. A. 1); Moyer v. Butte Miners' Union, 246 F. 657, 662 (C. C. A. 9); Horvath v. McCord R. & Mfg. Co., 35 F.(2d) 640 (C. C. A. 6).

This finding, however, would apply only to bar the relief of specific performance, and is not to be construed as a finding that appellee was entitled to terminate the contract. The provision as to "paying or marketable quantity" is also usually included in the original leases. There it obviously means a quantity which is "paying or marketable" from the viewpoint of the purchaser—from the point of view of him who has to pay. We see no substantial reason why the same criterion should not be applied where there has, in effect, been an equitable assignment of, or transfer of beneficial interest in, the leases themselves, provided the subject of the action were to give effect to such assignment or transfer. There is an apparent inconsistency in the position that a paying and marketable quantity of gas is being produced so as to justify continuance of operation by the lessee under the leases, but is not being produced so as to make effective the rights of the equitable owner of the gas. This is also emphasized by the use of the word "marketable," disjunctively with "paying," for "marketable" indicates any substantial quantity for which a purchaser could be found, and this is wholly independent of any question of price or profit to the producer.

But even if wrong in the conclusion that specific performance could not be granted for the reason above given, another insurmountable obstacle is presented. As already stated, the contract provides that the vendor shall diligently operate said lands for gas, and further provides for the construction, maintenance, and operation of the gathering lines and compressor station. By implication the right is also permitted to the vendor to temporarily block off producing wells and to pump from others as may in its opinion best preserve the life of the field. Wells may be abandoned and new wells may be drilled at the discretion of the vendor and while a court of equity is capable of undertaking supervision of such matters, by the use of experts and by the application of standard practices, especially where a public interest is involved (Joy v. St. Louis, 138 U. S. 1, 47, 11 S. Ct. 243, 34 L. Ed. 843; Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co., 163 U. S. 564, 601, et seq., 16 S. Ct. 1173, 41 L. Ed. 265; Schmidtz v. Louisville & N. R. Co., 101 Ky. 441, 41 S. W. 1015, 38 L. R. A. 809), the difficulties thus presented are usually considered as sufficient ground for refusing specific performance, in the exercise of that sound discretion always resting with the court. Rutland Marble Co. v. Ripley, 10 Wall. 339, 19 L. Ed. 955; Texas & Pac. Ry. Co. v. Marshall, 136 U. S. 393, 407, 10 S. Ct. 846, 34 L. Ed. 385; Javierre v. Central Altagracia, 217 U. S. 502, 508, 30 S. Ct. 598, 54 L. Ed. 859; York Haven W. & P. Co. v. York Haven Paper Co., 201 F. 270 (C. C. A. 3); Alexander v. Hamilton, 287 F. 508 (C. C. A. 8); Arizona Ed. Co. v. So. Sierras P. Co., 17 F.(2d) 739 (C. C. A. 9); Universal Rim Co. v. General Motors Corp., 20 F.(2d) 966 (D. C. Mich.). We cannot say that this discretion of the court below has been abused.

The bill seeks what is the equivalent of pure specific performance. We are of the opinion that this relief was properly denied; but we also think that under the prayer for an injunction of broader scope, and for general relief, it was within the power of the court to grant a more limited injunction against the sale of the gas elsewhere, or its use by the appellee, and to thus afford the appellant partial negative protection of its equitable interest in the gas. It is possible that this relief may not be desired by appellant, but it is proper that it not be foreclosed. For this reason the decree denying specific performance, as such, is affirmed and the cause is remanded to permit of further proceedings if prosecuted.

Affirmed and remanded.