# TEXAS AND PACIFIC RAILWAY COMPANY *v.* MARSHALL.

# MARSHALL *v.* TEXAS AND PACIFIC RAILWAY COMPANY.

### APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF TEXAS.

Nos. 293, 1105.  Argued April 23, 24, 1890. — Decided May 19, 1890.

The city of Marshall agreed to give to the Texas and Pacific Railway $300,000 in county bonds, and 66 acres of land within the city limits for shops and depots; and the company, " in consideration of the donation" agreed " to permanently establish its eastern terminus and Texas offices at the city of Marshall," and " to establish and construct at said city the main machine shops and car works of said railway company." The city performed its agreements, and the company, on its part, made Marshall its eastern terminus, and built depots and shops, and established its principal offices there.   After the expiration of a few years Marshall ceased to be the eastern terminus of the road, and some of the shops were removed.   The city filed this bill in equity to enforce the agreement, both as to the terminus and as to the shops; *Held,*

(1) That the contract on the part of the railway company was satisfied and performed when the company had established and kept a depot and offices at Marshall, and had set in operation car works and machine shops there, and had kept them going for eight years and until the interests of the railway company and of the public demanded the removal of some or all of these subjects of the contract to some other place;

(2) That the word " permanent " in the contract was to be construed with reference to the subject matter of the contract, and that, under the circumstances of this case it was complied with by the establishment of the terminus and the offices and shops contracted for, with no intention at the time of removing or abandoning them;

(3) That if the contract were to be interpreted as one to forever maintain the eastern terminus, and the shops and Texas offices at Marshall, without regard to the convenience of the public, it would become a contract that could not be enforced in equity;

(4) That the remedy of the city for the breach, if there was a breach, was at law.

THE court stated the case as follows:

These are appeals from a decree of the Circuit Court of the United States for the Eastern District of Texas. The suit was originally brought by the city of Marshall in the court of the Fourth Judicial District of the State of Texas against the Texas and Pacific Railway Company, and was afterwards removed by that company into the Circuit Court of the United States for the Eastern District of Texas. The suit was a bill in chancery which sought relief for a violation by the railway company of its contract that it would establish the eastern terminus of its railroad at the city of Marshall, in the State of Texas, and would also establish its principal offices of the road at that place.

The bill sets out as the written evidence of this contract a letter from F. B. Sexton, E. D. Blanch and M. D. Ector on the part of the city of Marshall to Thomas A. Scott, president of the railway company, and the reply of Mr. Scott to this communication. These letters are set out as exhibits to the bill and are as follows:

"MARSHALL, TEXAS, *June 26th,* 1872.

"Col. Thomas A. Scott, President of the Texas & Pacific Railway Company, Philadelphia, Penna.

"Sir: Pursuant to your request we now present to you, to be laid before the board of directors for the Texas and Pacific Railway Company, a written statement of the agreement made at Mrs. King's Hotel, in this city, on the 22d inst., between yourself, on behalf of said railway company, and the undersigned, on behalf of the city of Marshall.

"The county of Harrison (of which the city of Marshall is the county seat) has determined, in the manner required by

an act of the legislature of the State of Texas, passed April 12, 1871, to donate to said Texas and Pacific Railway Company three hundred thousand dollars in the bonds of said county, payable in gold coin, having thirty years to run, and bearing seven per centum interest per annum, and to levy a tax in the manner required by said act, to provide for the payment of the principal and interest of said bonds, upon the condition that said company shall establish its eastern terminus and Texas office at the city of Marshall, and shall locate and construct at said city its main machine shops and car works, thereby securing at said city the connections with said terminus provided for by the act incorporating said Texas and Pacific Railway Company and an act supplemental thereto.

" We understand that a full transcript of the orders and decrees of the county court of Harrison County in regard to this matter has been furnished you.

" In addition to this, the city of Marshall will donate to said company sixty-six acres of land at the place and in the shape designated by you on the map of said city, whereon to locate the main machine shops, car works, and depot of said company at said city.

" The city of Marshall will procure said land by issuing its bonds in accordance with the provisions of the act of the legislature of Texas already referred to, which bonds will be used in the purchase of said land.

" The citizens of Marshall have already undertaken to cash said bonds to an extent sufficient to purchase all of said land which cannot be procured by donation directly from the owners thereof.

" The details of acquiring the title to said land by your company will be attended to by the city, and were explained in our conversation with you.

" In consideration of the donation of the said sum of three hundred thousand dollars and said sixty-six acres of land, the said Texas and Pacific Railway Company will permanently establish its eastern terminus and Texas office at the city of Marshall, and will also establish and construct at said city

the main machine shops and car works of said railway company.

"Awaiting your reply, we are,

"Respectfully, your ob't servants,      F. B. SEXTON,
                                        "E. D. BLANCH,
                                        "M. D. ECTOR,
                "Committee on Part of City of Marshall."

"TEXAS AND PACIFIC RAILWAY COMPANY, OFFICE OF THE PRESIDENT.

                                "PHILADELPHIA, July 16, 1872.
"F. B. Sexton, E. D. Blanch, M. D. Ector, committee on behalf of the city of Marshall, Texas.

"GENTLEMEN : I am in receipt of your favor of June 26, setting forth arrangement between your committee and myself, as president of the Texas and Pacific Railway Company. The statement, as you make it, is satisfactory, and I will have the matter ratified at the first meeting of our board of directors; but the absence of Judge Pierrepont and Mr. Stebbins in Europe for a few weeks to look after our financial matters may prevent me from getting a quorum of our directors together, but in due time it shall all be arranged.

                "Very respectfully,
                        "THOMAS A. SCOTT, Pres."

The bill alleges that in pursuance of this contract the county of Harrison, of which the city of Marshall was the county seat, issued its $300,000 worth of bonds, which were sold and the proceeds paid over to the company, and that the city of Marshall purchased, at a cost of $60,000, the sixty-six acres of land mentioned in this contract and conveyed it to the railway company. This conveyance was by two separate deeds, and it is pertinent to note that in each one of these deeds it is recited that the ground was conveyed to the railroad company "whereon to locate the main machine shops, car works and depot of said company at said city," and that the Texas and Pacific Railway Company agreed to establish

its eastern terminus and Texas office at the city of Marshall, and also to establish and construct at said city the main machine shops and car works of said railway company.

Shortly after these contracts and conveyances, which were made and completed in the years 1872–3, the railway company did establish its principal offices at Marshall, constituting that city its eastern terminus; so that the court finds that "the contract was duly executed upon both sides, and that the eastern terminus of said railway company and the Texas office of said company and the main machine shops and car works of said railway company are and were established at the city of Marshall." The bill avers that although things remained in this condition until some time in December, 1881, the defendant has since that time moved various parts of its machine shops and its Texas office to other cities, and, in fact, has by various changes, not important to be recited here, caused the city of Marshall to cease to be the terminus of the road.

In the view that we shall take of this case it is not important to inquire what particular offices or what particular machinery, work shops, etc., of the railroad company have been removed from the city of Marshall, nor how far the railroad company has ceased to hold the city of Marshall as the eastern terminus of its road. It may be conceded that the allegations of the bill and the evidence in the case establish the fact that by the operations of said railway company the full and complete object of the city of Marshall in its contract with that company is not now accorded to it.

To the bill there was a demurrer, which being overruled, there was filed an answer by the company, and upon the final hearing the Circuit Court entered a decree forbidding the company from removing any more of its offices from the city of Marshall, and enjoining it to continue those which remained there, at that place, and otherwise to perform the contract. It did not, however, by any mandatory order decree that the corporation should restore to the city of Marshall the offices, the shops and the other things connected with its operations under the contract with that city, which it had removed. From

this decree both parties have appealed, the railway company denying that there was any ground of relief against it, and the city of Marshall on the ground that the complete relief which it sought had not been given to it.

*Mr. W. Hallett Phillips* for the city of Marshall.

I. The argument of the company is that the contract was fully performed by their establishing at Marshall the offices, machine shops and terminus, and that there was no obligation to retain them; that the county and city simply relied on the faith that, once established. the interest of the company would induce their retention.

The question then is, whether the donation by the county of $300,000 of bonds, and by the city of real estate costing $60,000, made upon the consideration that the company would make Marshall the eastern terminus, and permanently establish there its shops, car works and Texas offices, left it in the power of the company, at any time after receiving the benefits of the contract, to abandon Marshall, make another place its terminus, and remove its Texas office and shops?

Certainly such a construction of the bargain cannot be made unless imperatively called for by its terms.

The first inquiry must be as to the extent and meaning of the-contract.

The petition of the freeholders of Harrison, upon which the election was ordered to determine whether the bonds should be issued to the railway, specifies "that the said donation, to, be conditioned upon the fact that the eastern terminus of said railroad shall be permanently established at said city of Marshall, (the county seat,) with its Texas office and main shops."

This was the proposition submitted to the electors and contained in the contract with the county and city.

The general prosperity and growth of the city were the objects of the donation. The conditions of the contract to be performed by the company were commensurate in their importance with the large expenditure incurred by the county and city. The establishments of the company were to be fixed at

the city, and could not be removed by the company, unless acting in obedience to subsequent law applicable to the case.

Unless this is the true construction of the contract, no force can be attached to the provision as to permanency; for, under the opposing argument, that which was established one day could be removed the next. In fact the company in its answer contends for this right of immediate removal and to show their understanding of the contract, introduce a resolution of the board of directors of the company by which it was resolved "that the offices be located, *until otherwise ordered*, at Marshall." What sort of *permanency* is this, when it is shown that the establishments were *made* at Marshall until "*otherwise ordered?*" The case of *Mead* v. *Ballard*, 7 Wall. 290, relied on by opposing counsel is not applicable. There the whole question was whether the institute was obliged to rebuild on the land granted, or forfeit the same. The court held that inasmuch as the institute, by the terms of the grant, had to be permanently located within a year on penalty of reversion, such right of reversion ceased when the institute was established within the year, and the title was not subsequently divested by failure to rebuild, after the buildings had been destroyed by fire.

II. Assuming the contract to be legal, it is objected that equity is without jurisdiction. The argument seems to be that the company should be allowed to violate the contract and the city left to such redress as it may find in an action for damages.

But can it be the law that the city must give up all the public advantages secured to it by the contract and which constituted its sole consideration? Could any pecuniary compensation be the equivalent therefor?

It must be admitted to be very uncertain what damages could be recovered, unless, indeed, the amount is of the donation, a very inadequate recovery.

The remedy at law is not plain; it is not adequate nor complete.

The case seems to be peculiarly one in which the remedial and preventive jurisdiction of chancery can be invoked to

prevent by injunction the consummation of an injury, which cannot be estimated and sufficiently compensated by a pecuniary payment.

Another objection to the decree is that the court has no adequate means of enforcing it, because the court cannot compel the company to maintain and operate the shops at Marshall; that the decree is in effect one of specific performance.

But were it admitted that the court could not do complete justice to the city, that affords no sufficient reason why it should not repair, as far as lies in its power, the wrong inflicted and threatened, by an injunction, restraining the breach of the conditions of the contract, especially in a case like this where the defendant retains the full benefits resulting from the contract.

In order to sustain the decree, it is not necessary to decide whether the contract is one which, in the first instance, equity would specifically enforce. We deny that the agreement was such as is contended by appellant, or that obedience to the decree could only be enforced by undertaking the operation of the railroad. It is difficult to perceive why the court cannot prevent the removal of establishments acknowledged to have been made under the contract.

If the contract, as contended for the company, is one requiring the performance of continuous duties and supervision, that affords no reason why a court of equity should not by injunction prevent the violation of the contract. It is now settled by the decided weight of authority, that in such cases, although the affirmative specific performance of the contract is beyond the power of the court, its performance will be negatively enforced by enjoining its breach. *Western Union Tel. Co.* v. *Union Pacific Railroad*, 3 Fed. Rep. 423, 429.

*Mr. John F. Dillon* (with whom was *Mr. Harry Hubbard* on the brief) for the Texas and Pacific Railway Company.

*Mr. Augustus H. Garland* for the city of Marshall.

*Mr. James Turner* and *Mr. C. B. Kilgore* filed a brief for the city.

MR. JUSTICE MILLER, after stating the case, delivered the opinion of the court.

As regards the appeal of the railway company, two principal questions are presented. The first of these is, was there a valid contract that the corporation should not only establish its eastern terminus at Marshall City and put up there the depot buildings and machine shops, car works, etc., included in the contract, but should keep them there perpetually? Second, if this were so, is it a contract which a court of chancery should enforce?

If it were not for the word "permanent," as found in the communication of the committee of the city of Marshall to Mr. Scott, we should not think it easy to justify the inference that the obligation was to maintain forever at that place what the company engaged to establish there. The clause of the letter of this committee to Colonel Scott, which first mentions the conditions is, that the bonds of the county of Harrison were voted upon the condition, "that said company shall establish its eastern terminus and Texas office at the city of Marshall, and shall locate and construct at said city its main machine shops and car works, thereby securing at said city connections with said terminus provided for by the act incorporating said Texas and Pacific Railway Company and an act supplemental thereto." The same proposition is afterwards stated in the same letter in this form: "In consideration of the donation of the said sum of three hundred thousand dollars and said sixty-six acres of land, the said Texas and Pacific Railway Company will permanently establish its eastern terminus and Texas office at the city of Marshall, and will also establish and construct at said city the main machine shops and car works of said railway company."

The two conveyances by the city of the land which constituted the sixty-six acres in reciting the consideration for which the conveyance was made, speak of it, as we have already said, as an agreement to establish the eastern terminus at the city of Marshall, and also to construct at the city the main machine shops and car works of said railway company. This shows

that while the obligation of the company to establish its eastern terminus at the city of Marshall and construct its depot and machine shops and car works is spoken of at one time as an agreement to permanently establish these appurtenances to the railroad, yet at other times, when the same subject is mentioned as the consideration for what was done by the city and the same matters recited, the word "permanent" is omitted. The object of the city might very well be supposed to have been attained by the selection of the city as a terminus of the railroad, the construction and establishment there of its offices, its depot, its car manufactory and other machinery, since there was hardly any ground to suppose that the railroad company would ever have inducements enough to justify it in removing all these things to another place. And in point of fact it appears that for a period of about eight years they were permanently located at the city of Marshall. If, however, the city desired something more than this, if it desired to make sure that these establishments should forever remain within the limits of the city of Marshall, and that the railroad company should be bound to keep them there forever, such an extraordinary obligation should have been acknowledged in words which admitted of no controversy. It would have been very easy to have inserted into this contract language which forbade the company from ever removing the terminus of the road to some other point, or from ever removing or ceasing to use the depot, or the car and machine shops, and thus have made the obligation perpetual. But it seems to us that the real essence of the contract was that the railroad company should, in its process of construction, make this city its eastern terminus, and should establish there its depot, its machine shops and its car works; and that this should be done in the ordinary course of its business, with the purpose that it should be permanent. But it did not amount to a covenant that the company would never cease to make its eastern terminus at Marshall; that it would forever keep up the depot at that place; that it would for all time continue to have its machine shops and car shops there and that whatever might be the changes of time

and circumstances, of railroad rivalry and assistance, these things alone should remain forever unchangeable. Such a contract, while we do not say that it would be void on the ground of public policy, is undoubtedly so far objectionable as obstructing improvements and changes which might be for the public interest, and is so far a hindrance in the way of what might be necessary for the advantage of the railroad itself and of the community which enjoyed its benefits, that we must look the whole contract over critically before we decide that it bears such an imperative and such a remarkable meaning.

It appears to us, so far from this, that the contract on the part of the railroad company is satisfied and performed when it establishes and keeps a depot, and sets in operation car works and machine shops, and keeps them going for eight years, and until the interests of the railroad company and the public demand the removal of some or all of these subjects of the contract to some other place. This was the establishment at that point of the things contracted for in the agreement. It was the fair meaning of the words " permanent establishment," as there was no intention at the time of removing or abandoning them. The word " permanent" does not mean forever, or lasting forever, or existing forever. The language used is to be considered according to its nature and its relation to the subject matter of the contract, and we think that these things were permanently established by the railway company at Marshall.

A case almost precisely like the one under consideration came before this court and is reported in 7 Wall. 290, *Mead* v. *Ballard*. In that case the ancestor of Mead, on the 7th day of September, 1847, conveyed to Amos Lawrence, of Boston, a certain tract of land in Wisconsin, in which conveyance was the following language : " Said land being conveyed upon the express understanding and condition that the Lawrence Institute of Wisconsin, chartered by the legislature of said Territory, shall be permanently located upon said lands, and on failure of such location being made on or before the 7th day of September, 1848, and on repayment of the purchase money

without interest, the said land shall revert to and become the
property of said grantors." The board of trustees of the in-
stitute, on the 9th of August, 1848, passed a resolution locat-
ing the institution on the land described in the deed. The
necessary buildings were made, and the institution was in full
operation by November, 1849. The buildings cost about
$8000, but were burned down in the year 1857 and were
never rebuilt. But in 1853 a larger building, called the uni-
versity, was erected on an adjoining tract of land. Under
these circumstances, Mead, the heir of the grantor, ten-
dered the purchase money, demanded a reconveyance of the
land, and on its refusal brought suit. In that case, the
condition was for the permanent location of the univer-
sity. In the present case, the condition is for the perma-
nent establishment of the eastern terminus of the road, with
its machine shops, car works, etc. In that case the court held
that the contract was complied with when the trustees of the
institution located, by a resolution of its board, the university
on the ground conveyed, and built what was then the necessary
houses for its use. It also held that the word "permanent"
did not require of them to reconstruct these buildings when
they were burned down, and that the title to the land was not
forfeited because of this failure to rebuild, although they built
other houses on an adjoining tract of land; and though part
of the reasoning of the court is based upon the fact that the
contract in that case required the location of the institute to
be made within a year from the date of the deed, and that it
necessarily meant something which could be done within that
year, we do not see that the principle of the present case
varies much from that. The court said in that case that
"counsel for the plaintiff attach to the word 'permanent' in
this connection, a meaning inconsistent with the obvious intent
of the parties, that the condition was one which might be fully
performed within a year. Such a construction is something
more than a condition to locate. It is a covenant to build and
rebuild; a covenant against removal at any time; a covenant
to keep up an institution of learning on that land forever, or
for a very indefinite time. This could not have been the in-

tention of the parties." So we think of the present case. It cannot be supposed that the parties intended a covenant to build and rebuild, a covenant never to change any of its offices, or the place of manufacturing cars and other machinery necessary for the use of the company, nor that it would forever keep up, for the benefit of the town of Marshall, this establishment, when once organized.

But we are further of opinion, that if the contract is to be construed as the appellant insists it should be construed, it is not one to be enforced in equity. We have already shown that to decree the specific enforcement of this contract is to impose upon the company an obligation, without limit of time, to keep its principal office of business at the city of Marshall, to keep its main machine shops there, and its car works there, and its other principal offices there, although the exigencies of railroad business in the State of Texas may imperatively demand that these establishments, or some of them, should be removed to places other than the city of Marshall, and that this would be also required by the convenience of the public, in which case both the public convenience and the best interests of the railroad company would be sacrificed by a contract which is perpetual, that all of its business offices and business shall forever remain at Marshall.

It appears to us that if the city of Marshall has under such a contract a remedy for its violation, it is much more consonant to justice that the injury suffered by the city should be compensated by a single judgment in an action at law, and the railroad placed at liberty to follow the course which its best interests and those of the public demand. Nor do we see any substantial difficulty in ascertaining this compensation. Though there may not be any rule by which these damages can be estimated with precision, this is not a conclusive objection against a resort to a court of law, for it is very well known that in all judicial proceedings for injuries inflicted by one party on another, whether arising out of tort or out of contract, the relief given by way of damages is never the exact sum which compensates for the injury done, but, with all the rules which have been adopted for the measurement of damages, the relief is only approximately perfect.

There would be, in this instance, the sums of money advanced by the city, and possibly the bonds furnished by the county, as a means of ascertaining the compensation due to the city of Marshall.   Other considerations, such as the length of time that the contract has been complied with, the value of this compliance to the city, the probable loss of taxable property resulting from the violation of the contract, and other elements not necessary to be enumerated now, might enter into the question of damages, if the contract has really been violated.   On the other hand, the enforcement of the contract by a decree of the court requiring the company to, restore in all its fulness the offices, the workshops, and whatever has been removed from the city of Marshall, and the continued and perpetual compliance with all those conditions by the company, to be enforced in the future under the eye of a court of chancery, against the public interest, and, perhaps, manifestly to the prejudice and injury of the railroad company, exercising to some extent the public function authorized by the acts of Congress or of the legislature of Texas, present difficulties far more formidable than the action at law.

If the court had rendered a decree restoring all the offices and machinery and appurtenances of the road which have been removed from Marshall to other places, it must necessarily superintend the execution of this decree.   It must be making constant inquiry as to whether every one of the subjects of the contract which have been removed has been restored.   It must consider whether this has been done perfectly and in good faith, or only in an evasive manner.   It must be liable to perpetual calls in the future for like enforcement of the contract, and it assumes, in this way, an endless duty, inappropriate to the functions of the court, which is as ill-calculated to do this as it is to supervise and enforce a contract for building a house or building a railroad, both of which have in this country been declared to be outside of its proper functions, and not within its powers of specific performance.

The cases cited on this subject in the brief of counsel we think are conclusive.   In *Marble Company* v. *Ripley*, 10 Wall.

339, 358, it was said: "Another serious objection to a decree for a specific performance is found in the peculiar character of the contract itself, and in the duties which it requires of the owners of the quarries. These duties are continuous. They involve skill, personal labor and cultivated judgment. It is in effect a personal contract to deliver marble of certain kinds, in blocks of a kind that the court is incapable of determining whether they accord with the contract or not. The agreement being for a perpetual supply of marble, no decree the court can make will end the controversy. If performance be decreed, the case must remain in court forever, and the court to the end of time may be called upon to determine, not only whether the prescribed quantity of marble has been delivered, but whether every block was from the right place, whether it was *sound*, and whether it was of *suitable size* or *shape* or *proportion*."

This question was very fully considered, in reference to a contract for building a railroad, in the case of *Ross* v. *Union Pacific Railway Company*, 1 Wool. C. C. 26, in which nearly all the authorities up to that time are fully considered. It was decided that the court could not enter upon the duty of compelling one party to build a railroad, and the other party to pay for it according to contract. See also *Port Clinton Railroad Company* v. *Cleveland & Toledo Railroad Company*, 13 Ohio St. 544; *South Wales Railway Co.* v. *Wythes*, 5 DeG. M. & G. 880; *Powell Duffryn Steam Coal Co.* v. *Taff Vale Railway Company*, L. R. 9 Ch. 331.

Without more minute examination of the authorities on this subject, we are of opinion that the plaintiff is not entitled to any relief in a court of equity. The decree of the court granting such relief is therefore

*Reversed, and the case remanded to the Circuit Court with directions to dismiss the bill. As the appeal of the plaintiff therefore fails, it is to pay the costs of this court on both appeals.*

MR. JUSTICE BREWER dissented from both the grounds set forth in the opinion.