SAN ANTONIO, U. & G. R. CO. v. NUECES VALLEY TOWNSITE CO.

No. 8475.

Court of Civil Appeals of Texas. San Antonio.

Oct. 31, 1930.

Rehearing Overruled in Part and Granted in Part Dec. 10, 1930.

Rehearing Overruled Jan. 14, 1931.

**392**

Andrews, Streetman, Logue & Mobley, of Houston, and Davis & Eskridge, of San Antonio, for appellant.

Dodson & Ezell and Birkhead, Lang & Beckmann, all of San Antonio, for appellee.

COBBS, J.

This suit was brought by P. A. Vance and numerous other persons, resident citizens of North Pleasanton, in Atascosa county, seeking to enjoin appellant from removing its division headquarters, machine shops, roundhouses, etc., from the town of North Pleasanton, and to perform its contract. The court withdrew the case from the jury, and, in so far as the plaintiffs were concerned, rendered an interlocutory judgment in favor of defendants against the plaintiffs, which was made final in the judgment, from which no appeal was prosecuted by the plaintiffs.

On July 20, 1928, in vacation, appellee filed its petition in intervention, alleging that appellant was authorized to build its railroad but had no terminal facilities or roundhouse facilities in San Antonio for making necessary repairs to its cars and engines and operating its division headquarters; that North Pleasanton was the junction point of appellant's road from San Antonio. Appellee alleged that appellant had entered into a certain contract for the construction and permanent maintenance of its depots, machine shops, etc., in the town of North Pleasanton.

Appellee brought this suit for specific performance of the contract, and, if that be denied, then they seek to recover of appellant the damages sustained by reason of the breach of contract. The issue was submitted to the jury, and it properly found damages in favor of appellee, and this court upon the record of this case is requested to render judgment for damages against appellant.

The contract, it will be observed, bound and obligated appellant to permanently locate and establish its division headquarters and operate its machine shops, adequate to the needs of its railroad system of 320 miles of main line railroad, at North Pleasanton. Therefore the court properly construed the contract, and granted relief. North Pleasanton was built up with streets, with waterworks and other valuable buildings and hotels, suitable for a city of its size, and appellee alleges that it is seriously damaged and that property values have depreciated since the railroad company has abandoned the town. People came to North Pleasanton and in many instances invested everything they had upon the assurance that the shops and division headquarters and all that was permanently located would be permanently operated at North Pleaasanton. After the Missouri Pacific had taken it over, some of the employees, a few at a time, were gradually and quietly removed.

The contract between appellant and appellee, with reference to the location and establishment and operation of the railroad facilities at North Pleasanton was carried forward in the deed by which the appellee conveyed to appellant the property upon which it established its railway facilities at North Pleasanton.

Appellant had no money with which to buy land, and agreed that, if appellee would organize and acquire these lands and convey a portion to the railway company for the purpose in consideration therefor it would locate its permanent division headquarters, machine shops, roundhouses, etc., upon said land and permanently maintain and operate the same thereon. The land was purchased for a small consideration in money, and the deed contained the stipulation: "That the San Antonio, Uvalde & Gulf Railroad Company will locate its shops on part of the hereinafter described property."

The town site company was duly organized. and the property was conveyed. The deed recited a consideration of $10, which was never paid, and the further consideration "of the location and establishment of the permanent division headquarters of the San Antonio, Uvalde & Gulf Railroad System and permanent location and operation of machine shops adequate to the needs of the said San Antonio, Uvalde & Gulf Railroad System as now operated embracing approximately 320 miles of main line road. It is, however, not intended to prevent the said railroad company from establishing such supplemental repair shops at such other points on the said railroad as may be required by the needs of the said road."

Frank Kell and A. R. Ponder, who owned 52 per cent. of the stock of appellant railroad, made a contract with one of the subsidiaries of the Missouri Pacific System, the St. Louis-Brownsville & Mexico Railway, by which they agreed to sell all of their stock and bonds of the appellant for $1,560,000, and said contract further provided that the then management of appellant should continue to operate and control the property until the payment of a certain part of said consideration, and the sellers guaranteed that said railroad should be free from debt, except the debt represented by its present outstanding mortgage bonds.

It is undisputed that the New Orleans, Texas & Mexico Railway Company filed an application with the Interstate Commerce Commission, upon which orders were issued to permit it to acquire control of appellant, under subdivision 2 of section 5 of the Interstate Commerce Act (49 USCA § 5, subd. 2), and stated that it desired to acquire by purchase the entire issued and outstanding stock and all outstanding securities of appellant, and recited that the applicant was organized under the laws of Louisiana and that appel-

lant was incorporated under the laws of the state of Texas. The application further recited that such purchase, if consummated, would vest in the applicant, by virtue of the ownership of such securities, the unincumbered title to said properties, and recited that the amount the applicant had agreed to pay for said property, "free from all incumbrances, is the sum of $3,000,000," and it recited that the estimated value of the property of appellant was greatly in excess of $3,000,000, that the actual cost of reproduction new would greatly exceed said amount, and the earnings of the property, if brought into the Missouri Pacific System, would greatly exceed a fair return upon said sum of $3,000,000, and in addition thereto would afford said system increased tonnage and increased revenues for system lines.

The testimony shows that, soon after the Interstate Commerce Commission authorized the Missouri Pacific System to acquire control, the appellant began to move away certain officials and employees of the division headquarters, machine shops, etc., from North Pleasanton, moving away a few at a time, and continued to do so until this suit was filed, and then appellant maintained a number of employees there. However, they were so reduced, and at the time of the trial only 14 of the men were left working in the shops.

The judgment entered by the court is as follows:

"It is further ordered, adjudged and decreed by the court that the said defendant, San Antonio, Uvalde & Gulf Railroad Company, be and it is hereby required to keep and maintain its permanent division headquarters at North Pleasanton, Texas, and to permanently locate and operate the machine shops there adequate to the needs of said railroad system, embracing approximately 318 miles of main line road now owned by said defendant, and that its general superintendent, train master, chief dispatcher, master mechanic, and all other operating officials of the railroad and the employees thereof that are reasonably necessary for the operation of said division headquarters and machine shops of said railroad as an independent railroad system or other officials or employees who would perform the services usually performed by such officials and employees, be returned to their former place and position at North Pleasanton, Texas; and that it further have judgment against said defendant railroad for a mandatory injunction, and such injunction is hereby granted, commanding the said defendant railroad to at once keep and maintain its permanent division headquarters and operate its machine shops adequate to the needs of said railroad system embracing said 318 miles of main line road now owned by it and operated as an independent railroad at

North Pleasanton, Texas; and that said defendant be and it is hereby enjoined from establishing or maintaining its permanent division headquarters and machine shops, for the purpose of doing the machine and repair work of said railroad when operated as a separate and independent railroad system, embracing approximately 318 miles of main line road now owned by it, at any other place than at North Pleasanton, Texas, together with all the officers and employees reasonably necessary for the operation of said division headquarters and machine shops of said road as an independent railroad system, at North Pleasanton, Texas.

"Provided, however, that it is not intended by the above Judgment to prevent the said railroad company from establishing such supplemental repair shops at such other points on the said railroad as may be required by the needs of the said road.

"It is further ordered, adjudged and decreed by the Court that the said defendant railroad be and it is hereby required to specifically perform, as hereinbefore provided in this judgment, the contract evidenced by the deed from the said Townsite Company to the said railroad company dated November 18, 1913."

It is contended that the answer of the jury to special issue No. 1 is not supported by the evidence; that the answer to special issue No. 2 is not supported by the evidence; that the answer to special issue No. 3 is grossly excessive in the amount thereof; that the answer to special issue No. 5 is not supported by the evidence; that the answer to special issue No. 6 is grossly excessive; that the answer to special issue No. 7 is grossly excessive; that the answer to special issue No. 8 is grossly excessive; that the answer to special issue No. 9 is contrary to the undisputed evidence; and that the answer to special issue propounded by the defendant was likewise contrary to the undisputed evidence.

No complaint was properly made of the judgment of the court upon the special issues, nor as to form of judgment.

The contract required appellant to operate its division headquarters and machine shops at North Pleasanton adequate to its needs. The Constitution and laws of Texas as then construed prohibited the consolidation of railroads within the state of Texas, and prohibited the control of one railroad by another through the ownership of its stock. The contract meant that the appellant should maintain and operate said headquarters, machine shops, etc., adequate to the needs of said railroad, from day to day, or year to year, when operated as a separate railroad system.

There is nothing to support the contention that the public interest demands the abroga-

tion of the contract or its breach, but the finding of the jury is that the enforcement of this contract will not create any burden upon interstate commerce.

▇ The evidence does not support appellant's contention that the breach of the contract was in the interest of the public, because it was shown that the real purpose the parties had in mind was the production thereby of $350,000 of net revenue per annum to the Missouri Pacific System. It will not do to say, because appellant can save more money for its stockholders each year by breaching the contract than the damage it would inflict upon appellee, that therefore it has a perfect right to breach this contract. Appellant asserts the right to breach the contract because it and the Missouri Pacific System procured from the Interstate Commerce Commission an order authorizing the Missouri Pacific to acquire control of appellant by the acquisition of its stocks and bonds. But this order is not above the laws of Texas which govern its citizens.

An examination of the City of Marshall Case, 136 U. S. 393, 10 S. Ct. 846, 34 L. Ed. 385, and the case of Mead v. Ballard, 74 U. S. (7 Wall.) 290, 19 L. Ed. 190, shows that the contracts were different, in that there was no provision in the City of Marshall Case that the facilities should be operated permanently It merely required the establishment of the permanent headquarters and shops, whereas in the contract in the case at bar the appelthe facilities should be operated permanently. operate these facilities at North Pleasanton. In the Ballard Case it was held that the contract had reference to the character of buildings to be constructed, and when such buildings were constructed and were subsequently destroyed, there was no obligation resting upon the contracting party to rebuild.

Much argument is made and great stress is laid upon the opinion of the Interstate Commerce Commission with reference to the operation of the appellant railroad, and the great savings to be accomplished by the consolidated operation. But since the jury found that appellee was damaged by the breach of the contract and judgment was rendered for specific performance thereof, we consider that question settled.

It will be plainly seen from all the facts that the contract was not forced on the parties, but it was made at the request of appellant, and the jury found that the enforcement of the contract against the appellant would not be an undue burden upon Interstate Commerce, and there is no assignment attacking such finding.

The appellee has received no money from appellant, but the railroad company received from the town site company 24 acres of land, which it retains and uses.

We do not agree that the enforcement of the judgment would be a violation of section 1 of article 14 of the Amendments to the Constitution of the United States, in that it would deprive appellant of its property without due process of law. Appellant voluntarily brought about the condition that would make it more expensive to perform the contract than to breach it.

In the case of Merchants' Life Ins. Co. v. Griswold (Tex. Civ. App.) 212 S. W. 807, 810, the plaintiff was employed by the insurance company to write insurance, receiving certain percentage of the premiums in certain territory. While this contract was in existence, the insurance company amended its charter and changed its form of doing business and claimed that this authorized it to terminate the contract because it was no longer authorized to do business under the contract as entered into with the plaintiff by reason of the change of its charter. The court, in passing on the matter, states: "Neither an individual nor a corporation has the legal right to breach a contract for the reason that it may be to the financial interest of such party to do so. On the contrary, a party who breaches a contract is liable in damages therefor, even though such breach may have been occasioned by the act of God. Northern Ins. Co. v. Watkins [Tex. Civ. App.] 183 S. W. 431, 437; Atchison, T. & S. F. Ry. Co. v. Boyce [Tex. Civ. App.] 171 S. W. 1094."

This is not a case where the Interstate Commerce Commission, in the exercise of the powers conferred upon it by the Transportation Act, has ordered a consolidation of these properties. It is simply a case where the owners of the stock of appellant, acting in concert with the officers of the Missouri Pacific, entered into a contract, which the original owners of the stock of appellant considered advantageous to them, which permitted them to sell their stock for $3,000,000. Having been permitted by the Interstate Commerce Commission to make the purchase, which benefits the Missouri Pacific to the extent of $350,000 net per year, and which permitted the owners of the stock of appellant to sell the same for a net price of $3,000,000, the appellant now urges that it cannot comply with its contract with the appellee because it will cost appellant money to carry out the contract, and that therefore the public interest would be injuriously affected, and the laws of Congress violated. The findings of the jury establish that by this breach the appellee will be damaged to the extent of over $67,000. We cannot believe, in this situation, that the contentions of appellant will appeal to a court of equity.

▇ Under subdivision 2 of section 5 of the Interstate Commerce Act, the Interstate Commerce Commission may enter an order for the

acquisition of the control of another carrier, either under a lease or by the purchase of stock in any manner not involving the consolidation of such carriers into a single system for ownership and operation. The acquisition of the stock of appellant railroad by the Missouri Pacific System was not a consolidation within the meaning of the law. Appellant continued to be and still is a separate corporate entity, having its own officers and directors, and owning its line of railroad of 320 miles.

Appellee sued for specific performance of its contract, and prayed in the alternative that, if it be not entitled to the judgment for specific performance of the contract or for the injunctive relief prayed for, then it have judgment for its damages, and for general and special relief. While we do not think the benefit of specific performance in this case is available, we think the right to recover damages for the breach is.

The case was submitted to the jury on special issues as follows:

"Question No. 1. Has the Defendant since about February 1st, A. D. 1926, substantially failed to maintain its Division Headquarters, (as the term was mutually understood and intended by the parties at the time of the execution by Intervener, of the deed to Defendant, dated November 18, 1913), for its Railroad in the town of North Pleasanton?

"Question No. 2. Has the Defendant since about February 1st, 1926, substantially failed to maintain and operate its Machine Shops in North Pleasanton reasonably adequate to the needs occasioned by and arising from the operation of its approximately 320 miles of main line railroad?

"Question No. 3. What was the reasonable market value of all Intervener's 537 lots in North Pleasanton immediately preceding the defendant's failure, if any to so maintain its Division Headquarters and its failure, if any, to so maintain and operate its Machine Shops?

"Question No. 4. What is the reasonable market value at this time of all of said 537 lots?

"Question No. 5. Is the difference, if any, which you may find to exist in the value of said lots at this time and the value you may find to have existed at the time inquired about in Question No. 3, the direct result of the defendant's failure, if any, to so maintain its Division Headquarters, or its failure, if any, to so maintain and operate its Machine Shops in North Pleasanton?

"Question No. 9. Would the enforcement of the contract against the San Antonio, Uvalde & Gulf Railroad Company, as evidenced by the deed in evidence, and as related to the maintenance of Division Headquarters and

Machine Shops at North Pleasanton be an undue burden on Interstate Commerce?"

Special issue submitted at the request of appellant was as follows:

"Are the facilities now maintained and number of men now employed at North Pleasanton in connection with division headquarters and shops reasonably adequate and sufficient to take care of all the reasonable needs of said Railroad Company for such services as operated in November, 1913?"

The jury in their verdict answered questions Nos. 1 and 2, "Yes"; No. 3, "$80,550.00"; No. 4, "$13,425.00"; No. 5, "Yes"; No. 9, "No"; and the special issue requested by appellant, "No."

Questions Nos. 6, 7, and 8 inquired as to the value of the land conveyed by the appellee to appellant in consideration of the agreement to maintain and operate the division headquarters and machine shops at North Pleasanton, and the jury answered those questions, "$24,000.00."

The testimony is clear and convincing that the value of the property was increased originally by appellant's improvements and operation of the railroad. We think the evidence supported the finding that the property was worth about 50 cents on the dollar of what it was worth in 1925; that the cause of its reduction in value was moving the railroad people away from North Pleasanton, the men who worked for the railroad company together with other of its properties.

■ ▮▮▮ Appellee had such interest in this cause as allowed it to intervene and set it up.

It is our duty to render such judgment or decree as the court below should have rendered, except where there is some matter of fact to be ascertained or damage to be ascertained which is uncertain. Article 1856, R. S.

In this case the damages have been found and assessed by the jury at the sum of $67,000.

That part of the judgment granting a judgment for specific performance of the contract is hereby reversed and rendered. It is further ordered, adjudged, and decreed that that part of said judgment rendered by the trial court which denied any damages to appellee be, and the same is hereby, reversed, and judgment is rendered for the damages suffered by appellee in the sum of $67,000.

On Motion for Rehearing.

This was a suit for the specific performance of a contract and in the alternative for damages.

Appellant properly appealed from the judgment of the trial court on the question of specific performance, but no appeal was taken from the trial court's judgment in denying any recovery for damages, by either party, and errors are not cross-assigned.

396

It is strongly insisted and vigorously contended that no appeal has been taken by any one from this judgment, which only awarded specific performance and no damages. The record, in the opinion of the writer, shows enough done, and is sufficient upon which to entitle him to appeal, but in this my associates disagree.

In this I cannot agree with my associates. Appellee has very well supported its contention by a number of authorities, but I shall only quote from one. In Rodgers v. Farmers' Bank of Nolanville (Tex. Civ. App.) 264 S. W. 491, 496, it is said:

"The authorities hold, quite generally, that cross-assignments of error will not be considered on appeal when not filed in the trial court. But we are not prepared to hold that Courts of Civil Appeals, upon reversing a judgment of the trial court, are precluded from looking beyond the findings of the trial court in determining the proper disposition to be made of the case, merely because the successful party in the trial court has not followed up an exception to an adverse finding of fact and conclusion of law, with a formal cross-assignment of error.

"Where a judgment of the trial court is reversed, the appellate court is vested with a wide discretion in determining the proper disposition to be made of the cause. We would not be warranted, we think, in setting aside the trial court's findings and conclusions only in the respect complained of by appellant, leaving them intact in the respects favorable to appellant, where the statement of facts shows that the latter findings and conclusions are without support in the record. That in the interest of reaching a proper disposition of the case the appellate court has the power, after setting aside the findings and conclusions of the trial court in part, to set them aside in toto, we have no doubt."

This is passing upon the question raised in that case on a parallel with this case that "no assignment of error was filed in the trial court raising the issue." The court would not recognize and approve such a callous and harsh rule in the administration of justice.

If the opinion of my associates is the law in this case, then justice can only be obtained by reversing the case for a new trial where all the issues will be gone over again and justice properly administered.

PER CURIAM.

It is the opinion of this court that the former judgment herein should be set aside, and it is the judgment of this court that the judgment of the lower court granting specific performance be reversed, and judgment here rendered that appellee take nothing by its suit for specific performance and that the judgment of the lower court as to damages be reversed and the cause remanded for a trial as to damages.