## CENTRAL UNITED NAT. BANK OF CLEVELAND v. FORT SMITH & W. RY. CO. (BOONE, Intervener).

### No. 545.

District Court, W. D. Arkansas, Fort Smith Division.

April 3, 1940.

Hill, Fitzhugh & Brizzolara, of Fort Smith, Ark., for T. W. M. Boone, trustee.

Warner & Warner, of Fort Smith, Ark., for J. S. Parks, receiver, Fort Smith & W. Ry. Co.

Frederick E. Baukhages, III, of Washington, D. C., for Reconstruction Finance Corporation.

M. D. Green, of Oklahoma City, Okl., for Missouri, K. & T. R. Co.

Thomas B. Pryor, of Fort Smith, Ark., for Guy A. Thompson, trustee, Missouri Pac. R. Co.

RAGON, District Judge.

On November 20, 1900, an agreement was made and entered into between a committee representing the citizens of Fort Smith and the Fort Smith & Western Railroad Company, whereby certain lands were to be purchased by the citizens for the purposes of donating it to the railroad company and upon which the railroad company agreed they would construct their terminal facilities, together with necessary switches. It is not necessary to go into the details of the contract except to consider that portion of the contract which relates to the controversy involved in this law suit. The pertinent parts of this contract read as follows:

"In consideration of the delivery to the said Railroad Company of the possession of the lands and premises hereinbefore referred to, for the purpose of building its railroad and terminal equipments, and the conveyance of said lands to said Railroad Company when the said Railroad Company shall have complied with its contract and obligations, the said Railroad Company hereby contracts and agrees with the said Committee that it will within eighteen (18) months from the delivery of possession of said land and premises to it, for the purposes aforesaid, build, construct, maintain and put in operation a standard guage railroad from the city of Fort Smith, beginning at the premises herein referred to, to some point on the main line of the Missouri, Kansas & Texas Railroad as now

constructed, and within said eighteen months have said railroad equipped and in operation as a first-class railroad as a public carrier for both freight and passengers. Should the said Railroad Company fail to carry out its obligations and contract as herein set out, and within the time prescribed, it forfeits all its rights hereunder and is to receive none of the property conveyed to said trustee, and is to repay, as hereinbefore set out, the said Committee, or its successors, for and in behalf of the persons for whom they are acting, all money expended for condemnation of any land or other property, and the costs and expenses of such proceedings, and also pay such damages, if any, that may have been caused by said railroad to the land, or any part thereof, obtained by said Committee through purchase or donation. It is further agreed, however, that if the said Railroad Company shall not within the time prescribed build, construct and put in operation said railroad as herein required, then it may, at its option, pay to the Committee the monies expended by it in purchasing said land and such as it may have expended in having same condemned and all expenses thereof, with lawful interest thereon from the date of such payment and expenditures, upon which payment the said Committee shall cause said Trustee to convey said land to which he holds title to said Railroad Company, which option must be exercised in ninety (90) days from expiration of said eighteen (18) months."

On May 6, 1901, there was a supplemental contract entered into between the Citizens' Committee and the Railroad Company, the pertinent part of which reads as follows: "Provided that if at any time the said Fort Smith & Western Railroad Company or its assigns shall cease to operate said road, said terminals and all improvements thereon shall revert to the trustee for the benefit of the citizens of Fort Smith who subscribed and contributed towards purchasing or acquiring said terminal grounds in proportion to amount contributed."

Finally, on December 6, 1904, W. J. Johnston, who had been appointed as trustee for the Citizens' Committee, conveyed the terminal grounds to the Fort Smith & Western Railroad Company and in the conveyance was the following provision: "The foregoing conveyance is subject to the following conditions, to-wit: That if the said Fort Smith & Western, its successors or assigns, shall hereafter cease to operate its said railroad, as contemplated in said contract of November 20, 1900, and May 6, 1901, said Railroad Company, its successors or assigns, shall pay to the said W. J. Johnston, as trustee, or to his successor as such, for the benefit of the citizens of Fort Smith, who subscribed and contributed towards purchasing and acquiring said terminal grounds and right-of-way, in proportion to the amount so contributed, the actual cost price of said property, as set forth in the declaration of trust of the said Johnston, dated September, 19, 1901, as aforesaid."

Within recent months T. W. M. Boone was appointed trustee by the Chancery Court of Sebastian County, as successor to W. J. Johnston, who died several years ago. As such trustee he intervenes in this cause, seeking to recover the amount of $26,835, which he alleges was the amount subscribed by the citizens of Fort Smith and asks that this sum be paid out of certain funds in the hands of the receiver.

The record in this case discloses that at least one hundred twenty-five citizens of Fort Smith contributed to this fund which went in to the purchase of this land upon which the terminals were located. Evidently these citizens were inspired to contribute because they thought that a railroad running across the State of Oklahoma and connecting with the M. K. & T. would not only be a benefit to them as business men, but would likewise benefit the community in which they lived. On the other hand, the Railroad Company at that time could see a profitable operation of a railroad through this territory. Both sides knew at the time this contract was made that the most rapid transportation of commerce could only be carried on through a railroad. The citizens of Fort Smith knew that the volume of commerce in their trade territory at that time would be increased and that the boundaries of their trade territory would be greatly expanded; this, of course, being necessarily profitable to them. The Railroad Company knew that the cooperation of the citizens of Fort Smith would not only decrease the cost of construction of the railroad, but would go far in providing a stimulation of commerce sufficiently large to make the operation of the road profitable. They did not contemplate the construction of miles and miles of highly improved roadways paralleling their railroad over which the automobile and the truck would become the

most common carrier of commerce. After thirty-six years of effort to operate this road profitably there is not now a subscriber to the fund nor any one connected with the management of the railroad but what would readily admit that a profitable operation of this road in recent years has been impossible. Railroads situated as this one is have been made the prey of a new economic order, and their successful operation might well be said to have passed with the "horse and buggy" days. The field of profit and benefit that each of the contracting parties looked into the future and thought they saw has, by the force of economic laws, turned out a mere mirage. For more than twenty years this railroad has been staggering through bankruptcy courts. In fact, a strong argument is made that the intervention in this case should be dismissed because the road was once sold under a mortgage foreclosure in 1923. The impracticability of its successful operation has not only been recognized by the court, but the Interstate Commerce Commission recognizing the futility of successfully operating this road has directed its abandonment. The Railroad Company could not be expected to fulfill an obligation when economic laws over which it had no control made that fulfillment impossible. If the construction and maintenance of this road for thirty-six years has had a reward for any one, it is safe to say that it has been more productive to the citizens who made this contribution than it has to the management of the corporation.

While a statement in the opinion of Texas & Pacific Railway Company v. Scott, 5 Cir., 77 F. 726, 731, 37 L.R.A. 94, apparently was not necessary for a decision in the case, yet the principles of law announced therein have been amply sustained by numerous decisions. The Court said: "It cannot be true that an agreement on the part of a railway company to establish a station at a particular point is an agreement to keep it there forever. It must be that such an agreement is made subject to the general exigencies of business, the public interests, and to the change, modification, and growth of transportation routes, as these may affect the requirements of the railway company's business. The contract having this limitation, we think that the establishment of a railway station, and its maintenance, to the full extent expected or claimed, for 36 years, is, under all of the circumstances, a substantial and sufficient compliance with the terms of the contract relied on here."

This principle was followed in the case of Texas & P. R. Co. v. Marshall, 136 U.S. 393, 10 S.Ct. 846, 34 L.Ed. 385; Bryan v. Louisville & N. R. Co., 8 Cir., 244 F. 650; Little Rock & Fort Smith Ry. Co. v. Birnie, 59 Ark. 66, 26 S.W. 528. The effect of these decisions is that the maintenance and operation of a railroad in compliance with the provisions of deed, such as is involved in this case, is sufficiently complied with by an operation of the railroad for a period of thirty-six years. The agreement as outlined in the contracts and deeds in the instant case was unquestionably subject to the general exigencies of the business, public interest and to the modification and expansion of transportation routes. These conditions caused the court to direct the discontinuance of the railroad and the Interstate Commerce Commission to direct its abandonment.

If the conditions of the contracts of November 20, 1900, and that of April 6, 1904, were only to be considered, there is no doubt but what the principles of law announced in the foregoing decisions would apply. However, intervenor earnestly contends that the conditions carried in the deed constituted a covenant running with the land and that the purchase price of the property was the amount agreed upon by the parties as liquidated damages recoverable if and when there was a breach. The deed provides that if the railroad ceased to operate as contemplated in the contracts of November 20, 1900, and April 6, 1904, then the railroad or its successor should pay to the contributors the actual cost price of the property. The effect of this was to change the conditions in the deed only in relation to the penalty the railroad should suffer in case it had ceased to operate. The contributors, under this condition, were to receive the purchase price of the property in lieu of the title to the property in the event the railroad was abandoned. This, for obvious reasons, was more practical. I cannot agree that this modification by the parties should take it out of the application of the principles of law heretofore announced.

Accordingly, the intervention of T. W. M. Boone will be dismissed.